SCHRIRO, DIRECTOR, ARIZONA DEPARTMENT OF
CORRECTIONS *v.* SUMMERLIN

No. 03–526.   Argued April 19, 2004—Decided June 24, 2004

*John Pressley Todd*, Assistant Attorney General of Arizona, argued the cause for petitioner. With him on the briefs were *Terry Goddard*, Attorney General, *Mary R. O'Grady*, Solicitor General, *Kent E. Cattani*, Chief Counsel, and *Robert L. Ellman*, Assistant Attorney General.

*James A. Feldman* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Olson, Assistant Attorney General Wray*, and *Deputy Solicitor General Dreeben*.

*Ken Murray* argued the cause for respondent. With him on the brief were *Fredric F. Kay, Michael L. Burke, Leticia Marquez, John A. Stookey*, and *Daniel L. Kaplan*.*

JUSTICE SCALIA delivered the opinion of the Court.

In this case, we decide whether *Ring* v. *Arizona*, 536 U. S. 584 (2002), applies retroactively to cases already final on direct review.

---

*Briefs of *amici curiae* urging reversal were filed for the State of Nebraska et al. by *Jon Bruning*, Attorney General of Nebraska, and *J. Kirk Brown*, Solicitor General, and by the Attorneys General for their respective States as follows: *William H. Pryor, Jr.*, of Alabama, *Ken Salazar* of Colorado, *M. Jane Brady* of Delaware, *Charles J. Crist, Jr.*, of Florida, *Lisa Madigan* of Illinois, *Steve Carter* of Indiana, *Mike McGrath* of Montana, *Brian Sandoval* of Nevada, *Jim Petro* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Henry Dargan McMaster* of South Carolina, *Lawrence E. Long* of South Dakota, *Greg Abbott* of Texas, *Mark L. Shurtleff* of Utah, and *Jerry W. Kilgore* of Virginia; for the Arizona Voice for Victims, Inc., et al. by *Steve Twist* and *Douglas E. Beloof;* and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger.*

Briefs of *amici curiae* urging affirmance were filed for the National Association of Criminal Defense Lawyers by *Beth S. Brinkmann, Seth M. Galanter, David M. Porter*, and *Peter Goldberger;* and for Welsh S. White et al. by *Jeffrey T. Green, Mr. White, pro se*, and *Rudy Gerber, pro se.*

*Kate Lowenstein* and *Michael Avery* filed a brief of *amici curiae* for Murder Victims' Families for Reconciliation et al.

## I

In April 1981, Finance America employee Brenna Bailey disappeared while on a house call to discuss an outstanding debt with respondent Warren Summerlin's wife. That evening, an anonymous woman (later identified as respondent's mother-in-law) called the police and accused respondent of murdering Bailey. Bailey's partially nude body, her skull crushed, was found the next morning in the trunk of her car, wrapped in a bedspread from respondent's home. Police arrested respondent and later overheard him make incriminating remarks to his wife.

Respondent was convicted of first-degree murder and sexual assault. Arizona's capital sentencing provisions in effect at the time authorized the death penalty if one of several enumerated aggravating factors was present. See Ariz. Rev. Stat. Ann. §§ 13–703(E), (F) (West 1978), as amended by Act of May 1, 1979 Ariz. Sess. Laws ch. 144. Whether those aggravating factors existed, however, was determined by the trial judge rather than by a jury. § 13–703(B). In this case the judge, after a hearing, found two aggravating factors: a prior felony conviction involving use or threatened use of violence, § 13–703(F)(2), and commission of the offense in an especially heinous, cruel, or depraved manner, § 13–703(F)(6). Finding no mitigating factors, the judge imposed the death sentence. The Arizona Supreme Court affirmed on direct review. *State* v. *Summerlin*, 138 Ariz. 426, 675 P. 2d 686 (1983).

Protracted state and federal habeas proceedings followed. While respondent's case was pending in the Ninth Circuit, we decided *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000), and *Ring* v. *Arizona, supra.* In *Apprendi*, we interpreted the constitutional due-process and jury-trial guarantees to require that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U. S., at 490. In

*Ring*, we applied this principle to a death sentence imposed under the Arizona sentencing scheme at issue here. We concluded that, because Arizona law authorized the death penalty only if an aggravating factor was present, *Apprendi* required the existence of such a factor to be proved to a jury rather than to a judge. 536 U. S., at 603–609.[1] We specifically overruled our earlier decision in *Walton* v. *Arizona*, 497 U. S. 639 (1990), which had upheld an Arizona death sentence against a similar challenge. 536 U. S., at 609.

The Ninth Circuit, relying on *Ring*, invalidated respondent's death sentence. *Summerlin* v. *Stewart*, 341 F. 3d 1082, 1121 (2003) (en banc).[2] It rejected the argument that *Ring* did not apply because respondent's conviction and sentence had become final on direct review before *Ring* was decided. We granted certiorari. 540 U. S. 1045 (2003).[3]

## II

When a decision of this Court results in a "new rule," that rule applies to all criminal cases still pending on direct review. *Griffith* v. *Kentucky*, 479 U. S. 314, 328 (1987). As to convictions that are already final, however, the rule applies only in limited circumstances. New *substantive* rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms,

---

[1] Because Arizona law already required aggravating factors to be proved beyond a reasonable doubt, see *State* v. *Jordan*, 126 Ariz. 283, 286, 614 P. 2d 825, 828, cert. denied, 449 U. S. 986 (1980), that aspect of *Apprendi* was not at issue.

[2] Because respondent filed his habeas petition before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214, the provisions of that Act do not apply. See *Lindh* v. *Murphy*, 521 U. S. 320, 336–337 (1997).

[3] The State also sought certiorari on the ground that there was no *Apprendi* violation because the prior-conviction aggravator, exempt from *Apprendi* under *Almendarez-Torres* v. *United States*, 523 U. S. 224 (1998), was sufficient standing alone to authorize the death penalty. We denied certiorari on that issue, 540 U. S. 1045 (2003), and express no opinion on it.

352

see *Bousley* v. *United States,* 523 U. S. 614, 620–621 (1998), as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish, see *Saffle* v. *Parks,* 494 U. S. 484, 494–495 (1990); *Teague* v. *Lane,* 489 U. S. 288, 311 (1989) (plurality opinion).[4] Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal'" or faces a punishment that the law cannot impose upon him. *Bousley, supra,* at 620 (quoting *Davis* v. *United States,* 417 U. S. 333, 346 (1974)).

New rules of procedure, on the other hand, generally do not apply retroactively. They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise. Because of this more speculative connection to innocence, we give retroactive effect to only a small set of "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle, supra,* at 495 (quoting *Teague,* 489 U. S., at 311 (plurality opinion)). That a new procedural rule is "fundamental" in some abstract sense is not enough; the rule must be one "without which the likelihood of an accurate conviction is *seriously* diminished." *Id.,* at 313 (emphasis added). This class of rules is extremely narrow, and "it is unlikely that any . . . 'ha[s] yet to emerge.'" *Tyler* v. *Cain,* 533 U. S. 656, 667, n. 7 (2001) (quoting *Sawyer* v. *Smith,* 497 U. S. 227, 243 (1990)).

The Ninth Circuit agreed with the State that *Ring* announced a new rule. 341 F. 3d, at 1108–1109. It neverthe-

<hr/>

[4] We have sometimes referred to rules of this latter type as falling under an exception to *Teague*'s bar on retroactive application of procedural rules, see, *e. g., Horn* v. *Banks,* 536 U. S. 266, 271, and n. 5 (2002) *(per curiam);* they are more accurately characterized as substantive rules not subject to the bar.

less applied the rule retroactively to respondent's case, relying on two alternative theories: first, that it was substantive rather than procedural; and second, that it was a "watershed" procedural rule entitled to retroactive effect. We consider each theory in turn.

## A

A rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes. See *Bousley, supra,* at 620–621 (rule "hold[s] that a . . . statute does not reach certain conduct" or "make[s] conduct criminal"); *Saffle, supra,* at 495 (rule "decriminalize[s] a class of conduct [or] prohibit[s] the imposition of . . . punishment on a particular class of persons"). In contrast, rules that regulate only the *manner of determining* the defendant's culpability are procedural. See *Bousley, supra,* at 620.

Judged by this standard, *Ring*'s holding is properly classified as procedural. *Ring* held that "a sentencing judge, sitting without a jury, [may not] find an aggravating circumstance necessary for imposition of the death penalty." 536 U. S., at 609. Rather, "the Sixth Amendment requires that [those circumstances] be found by a jury." *Ibid.* This holding did not alter the range of conduct Arizona law subjected to the death penalty. It could not have; it rested entirely on the Sixth Amendment's jury-trial guarantee, a provision that has nothing to do with the range of conduct a State may criminalize. Instead, *Ring* altered the range of permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing on punishment. Rules that allocate decisionmaking authority in this fashion are prototypical procedural rules, a conclusion we have reached in numerous other contexts. See *Gasperini* v. *Center for Humanities, Inc.,* 518 U. S. 415, 426 (1996) (*Erie* doctrine); *Landgraf* v. *USI Film Products,* 511 U. S. 244, 280–281

(1994) (antiretroactivity presumption); *Dobbert* v. *Florida,* 432 U. S. 282, 293–294 (1977) (*Ex Post Facto* Clause).

Respondent nevertheless argues that *Ring* is substantive because it modified the elements of the offense for which he was convicted. He relies on our statement in *Ring* that, "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." 536 U. S., at 609 (citation omitted); see also *Sattazahn* v. *Pennsylvania,* 537 U. S. 101, 111 (2003) (plurality opinion). The Ninth Circuit agreed, concluding that *Ring* "reposition[ed] Arizona's aggravating factors as elements of the separate offense of capital murder and reshap[ed] the structure of Arizona murder law." 341 F. 3d, at 1105.

A decision that modifies the elements of an offense is normally substantive rather than procedural. New elements alter the range of conduct the statute punishes, rendering some formerly unlawful conduct lawful or vice versa. See *Bousley,* 523 U. S., at 620–621. But that is not what *Ring* did; the range of conduct punished by death in Arizona was the same before *Ring* as after. *Ring* held that, because Arizona's statutory aggravators restricted (as a matter of state law) the class of death-eligible defendants, those aggravators *effectively were* elements for federal constitutional purposes, and so were subject to the procedural requirements the Constitution attaches to trial of elements. 536 U. S., at 609. This Court's holding that, *because Arizona* has made a certain fact essential to the death penalty, that fact must be found by a jury, is not the same as *this Court's* making a certain fact essential to the death penalty. The former was a procedural holding; the latter would be substantive. The Ninth Circuit's conclusion that *Ring* nonetheless "reshap[ed] the structure of Arizona murder law," 341 F. 3d, at 1105, is particularly remarkable in the face of the Arizona Supreme Court's previous conclusion to the contrary. See *State* v.

*Towery,* 204 Ariz. 386, 390–391, 64 P. 3d 828, 832–833, cert. dism'd, 539 U. S. 986 (2003).[5]

## B

Respondent argues in the alternative that *Ring* falls under the retroactivity exception for " 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle,* 494 U. S., at 495 (quoting *Teague,* 489 U. S., at 311). He offers several reasons why juries are more accurate factfinders, including the tendency of group deliberation to suppress individual eccentricities; the jury's protection from exposure to inadmissible evidence; and its better representation of the common sense of the community. The Ninth Circuit majority added others, including the claim that a judge might be too acclimated to capital sentencing and that he might be swayed by political pressure. 341 F. 3d, at 1109–1116. Respondent further notes that common-law authorities praised the jury's factfinding ability. See, *e. g.,* 3 W. Blackstone, Commentaries on the Laws of England 380 (1768); *Georgia* v. *Brailsford,* 3 Dall. 1, 4 (1794) (jury charge of Jay, C. J.).

The question here is not, however, whether the Framers believed that juries are more accurate factfinders than judges (perhaps so—they certainly thought juries were more independent, see *Blakely* v. *Washington, ante,* at 305–308). Nor is the question whether juries actually *are* more accurate factfinders than judges (again, perhaps so). Rather, the question is whether judicial factfinding so *"seriously* dimin-

---

[5] Respondent also argues that *Ring* was substantive because our understanding of Arizona law changed. Compare *Ring* v. *Arizona,* 536 U. S. 584, 602–603 (2002), with *Apprendi* v. *New Jersey,* 530 U. S. 466, 496–497 (2000). Even if our understanding of state law changed, however, the actual content of state law did not. See *State* v. *Ring,* 200 Ariz. 267, 279, 25 P. 3d 1139, 1151 (2001), rev'd on other grounds, 536 U. S. 584 (2002); *State* v. *Gretzler,* 135 Ariz. 42, 54, 659 P. 2d 1, 13, cert. denied, 461 U. S. 971 (1983); *Johnson* v. *Fankell,* 520 U. S. 911, 916 (1997).

ishe[s]" accuracy that there is an "'impermissibly large risk'" of punishing conduct the law does not reach. *Teague, supra,* at 312–313 (quoting *Desist* v. *United States,* 394 U. S. 244, 262 (1969) (Harlan, J., dissenting)) (emphasis added). The evidence is simply too equivocal to support that conclusion.

First, for every argument why juries are more accurate factfinders, there is another why they are less accurate. The Ninth Circuit dissent noted several, including juries' tendency to become confused over legal standards and to be influenced by emotion or philosophical predisposition. 341 F. 3d, at 1129–1131 (opinion of Rawlinson, J.) (citing, *inter alia,* Eisenberg & Wells, Deadly Confusion: Juror Instructions in Capital Cases, 79 Cornell L. Rev. 1 (1993); Garvey, The Emotional Economy of Capital Sentencing, 75 N. Y. U. L. Rev. 26 (2000); and Bowers, Sandys, & Steiner, Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Guilt-Trial Experience, and Premature Decision Making, 83 Cornell L. Rev. 1476 (1998)). Members of this Court have opined that judicial sentencing may yield more consistent results because of judges' greater experience. See *Proffitt* v. *Florida,* 428 U. S. 242, 252 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.). Finally, the mixed reception that the right to jury trial has been given in other countries, see Vidmar, The Jury Elsewhere in the World, in World Jury Systems 421–447 (N. Vidmar ed. 2000), though irrelevant to the meaning and continued existence of that right under our Constitution, surely makes it implausible that judicial factfinding so "*seriously* diminishe[s]" accuracy as to produce an "'impermissibly large risk'" of injustice. When so many presumably reasonable minds continue to disagree over whether juries are better factfinders *at all,* we cannot confidently say that judicial factfinding *seriously* diminishes accuracy.

Our decision in *DeStefano* v. *Woods,* 392 U. S. 631 (1968) *(per curiam),* is on point. There we refused to give retroac-

tive effect to *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), which applied the Sixth Amendment's jury-trial guarantee to the States. While *DeStefano* was decided under our pre-*Teague* retroactivity framework, its reasoning is germane. We noted that, although "the right to jury trial generally tends to prevent arbitrariness and repression[,] . . . '[w]e would not assert . . . that every criminal trial—or any particular trial—held before a judge alone is unfair or that a defendant may never be as fairly treated by a judge as he would be by a jury.'" 392 U. S., at 633–634 (quoting *Duncan, supra,* at 158). We concluded that "[t]he values implemented by the right to jury trial would not measurably be served by requiring retrial of all persons convicted in the past by procedures not consistent with the Sixth Amendment right to jury trial." 392 U. S., at 634. If under *DeStefano* a trial held entirely without a jury was not impermissibly inaccurate, it is hard to see how a trial in which a judge finds only aggravating factors could be.

The dissent contends that juries are more accurate because they better reflect community standards in deciding whether, for example, a murder was heinous, cruel, or depraved. *Post,* at 361–362 (opinion of BREYER, J.). But the statute here does not condition death eligibility on whether the offense is heinous, cruel, or depraved *as determined by community standards.* See Ariz. Rev. Stat. Ann. § 13–703(F)(6) (West 1978). It is easy to find enhanced accuracy in jury determination when one redefines the statute's substantive scope in such manner as to ensure that result. The dissent also advances several variations on the theme that death is different (or rather, "dramatically different," *post,* at 363). Much of this analysis is not an application of *Teague,* but a rejection of it, in favor of a broader endeavor to "balance competing considerations," *post,* at 362. Even were we inclined to revisit *Teague* in this fashion, we would not agree with the dissent's conclusions. Finally, the dissent notes that, in *DeStefano,* we considered factors other than

enhanced accuracy that are no longer relevant after *Teague*. See *post*, at 365. But we held in that case that *"[a]ll three factors favor only prospective application of the rule."* 392 U. S., at 633 (emphasis added). Thus, the result would have been the same even if enhanced accuracy were the sole criterion for retroactivity.[6]

\*    \*    \*

The right to jury trial is fundamental to our system of criminal procedure, and States are bound to enforce the Sixth Amendment's guarantees as we interpret them. But it does not follow that, when a criminal defendant has had a full trial and one round of appeals in which the State faithfully applied the Constitution as we understood it at the time, he may nevertheless continue to litigate his claims indefinitely in hopes that we will one day have a change of heart. *Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review. The contrary judgment of the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

In *Ring* v. *Arizona*, 536 U. S. 584 (2002), this Court held that a jury, not a judge, must make the findings necessary to

---

[6] The dissent distinguishes *DeStefano* on the ground that "this case involves only a small subclass of defendants deprived of jury trial rights, the relevant harm within that subclass is more widespread, the administration of justice problem is far less serious, and the reliance interest less weighty." *Post*, at 366. But the first, third, and fourth of these points are irrelevant under *Teague*, and the second, insofar as it relates to accuracy, is an unsubstantiated assertion. If jury trial significantly enhances accuracy, we would not have been able to hold as we did in *DeStefano* that the first factor—"prevent[ing] arbitrariness and repression," 392 U. S., at 633—did not favor retroactivity.

qualify a person for punishment by death. In my view, that holding amounts to a "watershed" procedural ruling that a federal habeas court must apply when considering a constitutional challenge to a "final" death sentence—*i. e.*, a sentence that was already final on direct review when *Ring* was decided.

*Teague* v. *Lane,* 489 U. S. 288 (1989) (plurality opinion), sets forth the relevant retroactivity criteria. A new procedural rule applies retroactively in habeas proceedings if the new procedure is (1) "implicit in the concept of ordered liberty," implicating "fundamental fairness," and (2) "central to an accurate determination of innocence or guilt," such that its absence "creates an impermissibly large risk that the innocent will be convicted." *Id.,* at 311–313 (plurality opinion) (internal quotation marks omitted). In the context of a death sentence, where the matter is not one of "innocence or guilt," the second criterion asks whether the new procedure is *"central to an accurate determination"* that death is a *legally appropriate punishment. Id.,* at 313 (emphasis added). See *Sawyer* v. *Smith,* 497 U. S. 227, 244 (1990); *O'Dell* v. *Netherland,* 521 U. S. 151, 171, n. 3 (1997) (STEVENS, J., dissenting).

The majority does not deny that *Ring* meets the first criterion, that its holding is "implicit in the concept of ordered liberty." Cf. *Apprendi* v. *New Jersey,* 530 U. S. 466, 499 (2000) (SCALIA, J., concurring) (absent *Apprendi*'s rule jury trial right "has no intelligible content"); *Ring, supra,* at 610 (SCALIA, J., concurring) (*Apprendi* involves the fundamental meaning of the jury trial guarantee); *Blakely* v. *Washington, ante,* at 301–302 (tracing *Apprendi*'s conception of the jury trial right back to Blackstone); *Duncan* v. *Louisiana,* 391 U. S. 145, 157–158 (1968) (Sixth Amendment jury trial guarantee is a "fundamental right"). Rather, the majority focuses on whether *Ring* meets the second criterion: Is its rule "central to an accurate determination" that death is a legally appropriate punishment? *Teague, supra,* at 313.

As I explained in my separate concurrence in *Ring*, I believe the Eighth Amendment demands the use of a jury in capital sentencing because a death sentence must reflect a community-based judgment that the sentence constitutes proper retribution. See 536 U. S., at 614 (opinion concurring in judgment); see also *Harris* v. *Alabama*, 513 U. S. 504, 515–526 (1995) (STEVENS, J., dissenting); *Spaziano* v. *Florida*, 468 U. S. 447, 467–490 (1984) (STEVENS, J., concurring in part and dissenting in part). And a jury is significantly more likely than a judge to "express the conscience of the community on the ultimate question of life or death." *Witherspoon* v. *Illinois*, 391 U. S. 510, 519 (1968). As JUSTICE STEVENS has pointed out:

> "Juries—comprised as they are of a fair cross section of the community—are more representative institutions than is the judiciary; they reflect more accurately the composition and experiences of the community as a whole, and inevitably make decisions based on community values more reliably, than can that segment of the community that is selected for service on the bench." *Spaziano, supra,* at 486–487 (footnote omitted).

On this view of the matter, the right to have jury sentencing in the capital context is both a fundamental aspect of constitutional liberty and also significantly more likely to produce an accurate assessment of whether death is the appropriate punishment.

But my view is not the *Ring* majority's view. The majority held only that the jury must decide whether the special aggravating factors that make the offender *eligible* for death are present. 536 U. S., at 603–609. And it rested its decision that a jury, not a judge, must make that determination upon the Court's Sixth Amendment holding in *Apprendi* that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," 530 U. S., at 490.

In this case, the majority says that *Ring's* *Apprendi*-related rule cannot satisfy *Teague's* accuracy-enhancing requirement, for two reasons. First, it points out that for "every argument why juries are more accurate factfinders, there is another why they are less accurate." *Ante,* at 356. Hence, one cannot say "confidently" that "judicial factfinding *seriously* diminishes accuracy." *Ibid.* (emphasis in original). Second, it relies on *DeStefano* v. *Woods,* 392 U. S. 631 (1968) *(per curiam),* the case in which this Court considered whether *Duncan* v. *Louisiana, supra,* which extended the Sixth Amendment jury trial guarantee to the States, should apply retroactively. The Court decided that *Duncan* should *not* have retroactive effect. "If," the majority concludes, "a trial held entirely without a jury was not impermissibly inaccurate, it is hard to see how a trial in which a judge finds only aggravating factors could be." *Ante,* at 357.

The majority, however, overlooks three additional considerations that lead me to the opposite conclusion.

*First,* the factfinder's role in determining the applicability of aggravating factors in a death case is a special role that can involve, not simply the finding of brute facts, but also the making of death-related, community-based value judgments. The leading single aggravator charged in Arizona, for example, requires the factfinder to decide whether the crime was committed in an "especially heinous, cruel, or depraved manner." Ariz. Rev. Stat. Ann. § 13–703(F)(6) (West Supp. 2003); see Office of Attorney General, State of Arizona, Capital Case Commission Final Report (2002). Three of the other four *Ring*-affected States use a similar aggravator. See Colo. Rev. Stat. § 18–1.3–1201(5)(j) (Lexis 2003); Idaho Code § 19–2515(9)(e) (Lexis Supp. 2003); Neb. Rev. Stat. § 29–2523(1)(d) (1995). Words like "especially heinous," "cruel," or "depraved"—particularly when asked in the context of a death sentence proceeding—require reference to community-based standards, standards that incorporate values. (Indeed, Nebraska's standard explicitly asks the fact-

finder to assess the defendant's conduct in light of "ordinary standards of morality and intelligence." *Ibid.*) A jury is better equipped than a judge to identify and to apply those standards accurately. See *supra,* at 360.

*Second, Teague*'s basic purpose strongly favors retroactive application of *Ring*'s rule. *Teague*'s retroactivity principles reflect the Court's effort to balance competing considerations. See 489 U. S., at 309–313; *Mackey* v. *United States,* 401 U. S. 667, 675 (1971) (Harlan, J., concurring in two judgments and dissenting in one); *Desist* v. *United States,* 394 U. S. 244, 256 (1969) (Harlan, J., dissenting). On the one hand, interests related to certain of the Great Writ's basic objectives—protecting the innocent against erroneous conviction or punishment and assuring fundamentally fair procedures—favor applying a new procedural rule retroactively. *Teague, supra,* at 312–313; *Mackey,* 401 U. S., at 693–694. So too does the legal system's commitment to "equal justice"—*i. e.,* to "assur[ing] a uniformity of ultimate treatment among prisoners." *Id.,* at 689.

Where death-sentence-related factfinding is at issue, these considerations have unusually strong force. This Court has made clear that in a capital case "the Eighth Amendment requires a greater degree of accuracy . . . than would be true in a noncapital case." *Gilmore* v. *Taylor,* 508 U. S. 333, 342 (1993). Hence, the risk of error that the law can tolerate is correspondingly diminished. At the same time, the "qualitative difference of death from all other punishments"—namely, its severity and irrevocability—"requires a correspondingly greater degree of scrutiny of the capital sentencing determination" than of other criminal judgments. *California* v. *Ramos,* 463 U. S. 992, 998–999 (1983); see also *Spaziano,* 468 U. S., at 468 (STEVENS, J., concurring in part and dissenting in part) (the Eighth Amendment mandates special safeguards to ensure that death is "a justified response to a given offense"); *Ake* v. *Oklahoma,* 470 U. S. 68,

87 (1985) (Burger, C. J., concurring in judgment) ("In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases").

Consider, too, the law's commitment to uniformity. *Mackey, supra,* at 689. Is treatment "uniform" when two offenders each have been sentenced to death through the use of procedures that we now know violate the Constitution—but one is allowed to go to his death while the other receives a new, constitutionally proper sentencing proceeding? Outside the capital sentencing context, one might understand the nature of the difference that the word "finality" implies: One prisoner is already serving a final sentence, the other's has not yet begun. But a death sentence is different in that it seems to be, and it is, an entirely future event—an event not yet undergone by either prisoner. And in respect to that event, both prisoners are, in every important respect, in the same position. I understand there is a "finality-based" difference. But given the dramatically different nature of death, that difference diminishes in importance.

Certainly the ordinary citizen will not understand the difference. That citizen will simply witness two individuals, both sentenced through the use of unconstitutional procedures, one individual going to his death, the other saved, all through an accident of timing. How can the Court square this spectacle with what it has called the "vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason"? *Beck* v. *Alabama,* 447 U. S. 625, 637–638 (1980) (internal quotation marks omitted).

JUSTICE SCALIA's observation, in his concurring opinion in *Ring,* underscores the point. He wrote there that "the repeated spectacle of a man's going to his death because *a judge* found that an aggravating factor existed" would undermine "our people's traditional . . . veneration for the protection of the jury in criminal cases." 536 U. S., at 612 (emphasis in original). If that is so, it is equally so whether

the *judge* found that aggravating factor before or after *Ring*.

On the other hand, *Teague* recognizes that important interests argue against, and indeed generally forbid, retroactive application of new procedural rules. These interests include the "interest in insuring that there will at some point be the certainty that comes with an end to litigation"; the desirability of assuring that "attention will ultimately be focused not on whether a conviction was free from error but rather on whether the prisoner can be restored to a useful place in the community"; and the fact that society does not have endless resources to spend upon retrials, which (where witnesses have become unavailable and other evidence stale) may well produce unreliable results. *Mackey, supra,* at 690–691 (internal quotation marks omitted); see also *Teague,* 489 U. S., at 308–310. Comity interests and respect for state autonomy point in the same direction. See *id.,* at 308; *Engle* v. *Isaac,* 456 U. S. 107, 128, n. 33 (1982).

Certain of these interests are unusually weak where capital sentencing proceedings are at issue. Retroactivity here, for example, would not require inordinate expenditure of state resources. A decision making *Ring* retroactive would affect approximately 110 individuals on death row. Court Hears Arguments in Latest Death Case, N. Y. L. J., Apr. 20, 2004, p. 5. This number, however large in absolute terms, is small compared with the approximately 1.2 million individuals presently confined in state prisons. U. S. Dept. of Justice, Bureau of Justice Statistics Bulletin, Prisoner and Jail Inmates at Midyear 2003, p. 2 (May 2004). Consequently, the impact on resources is likely to be much less than if a rule affecting the ordinary criminal process were made retroactive.

Further, where the issue is "life or death," the concern that "attention . . . ultimately" should be focused "on whether the prisoner can be restored to a useful place in the community" is barely relevant. *Mackey,* 401 U. S., at 690 (internal

quotation marks omitted). Finally, I believe we should discount ordinary finality interests in a death case, for those interests are comparative in nature and death-related collateral proceedings, in any event, may stretch on for many years regardless. Cf. *Teague, supra,* at 321, n. 3 (STEVENS, J., concurring in part and concurring in judgment) ("A major reason that Justice Harlan espoused limited retroactivity in collateral proceedings was the interest in making convictions final, an interest that is wholly inapplicable to the capital sentencing context").

*Third, DeStefano* v. *Woods,* 392 U. S. 631 (1968) *(per curiam),* fails to give the majority the support for which it hopes. *DeStefano* did decide that *Duncan*'s holding—that the Sixth Amendment jury trial right applies to the States—should *not* have retroactive effect. But the Court decided *DeStefano* before *Teague.* And it explicitly took into account "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." 392 U. S., at 633 (internal quotation marks omitted).

The latter two factors, "reliance" and "effect on the administration of justice," argued strongly against retroactivity. Retroactivity there, unlike here, would have thrown the prison doors open wide—at least in Louisiana and possibly in other States as well. *Id.,* at 634. The Court believed that the first factor—"the purpose to be served by the new standards"—also favored prospective application only. But the Court described that purpose broadly, as "prevent[ing] arbitrariness and repression"; it recognized that some judge-only trials might have been fair; and it concluded that the values served by the jury trial guarantee "would not measurably be served by requiring retrial of *all* persons convicted in the past" without a jury. *Id.,* at 633–634 (emphasis added).

By contrast, this case involves only a small subclass of defendants deprived of jury trial rights, the relevant harm within that subclass is more widespread, the administration of justice problem is far less serious, and the reliance interest less weighty. For these reasons, I believe the *DeStefano* Court would have come out differently had it been considering *Ring*'s rule. Insofar as *DeStefano* has any relevance here, it highlights the importance, when making retroactivity decisions, of taking account of the considerations that underlie *Teague*'s categorical rules. And, as shown above, those considerations argue in favor of retroactivity in this case. See *supra,* at 362–365.

As I have pointed out, the majority does not deny that *Ring*'s rule makes *some* contribution to greater accuracy. It simply is unable to say "confidently" that the absence of *Ring*'s rule creates an "'"impermissibly large risk"'" that the death penalty was improperly imposed. *Ante,* at 356. For the reasons stated, I believe that the risk is one that the law need not and should not tolerate. Judged in light of *Teague*'s basic purpose, *Ring*'s requirement that a jury, and not a judge, must apply the death sentence aggravators announces a watershed rule of criminal procedure that should be applied retroactively in habeas proceedings.

I respectfully dissent.