HARTZ, Circuit Judge,
dissenting:
I respectfully dissent from the affirmance of the punitive-damages award. I do not believe that a reasonable jury could have found by clear and convincing evidence that UPS authorized or ratified Sloan’s retaliation. In addition, I write separately to express my disagreement with UPS’s argument on an issue that has divided the district judges in Kansas but is not addressed by the majority opinion— namely, the argument that Kan. Stat. Ann. § 60-3702(a) is procedural for purposes of the Erie doctrine. I would hold that state statutes allocating decision-making to a judge rather than a jury “are prototypical procedural rules,” Schriro v. Summerlin, 542 U.S. 348, 353, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), and therefore are superseded by federal law in federal-court trials.
Sufficiency of the Evidence
Although I am not dissenting from the panel decision affirming the verdict that Sloan retaliated against Jones for filing a workers’ compensation claim, the evidentiary support for the verdict is thin. My particular concern is the element of causation — that is, whether Sloan’s misconduct was motivated by Jones’s having filed a workers’ compensation claim. The majority opinion agrees with Jones that causation is shown by the “close temporal proximity between the filing of [his] workers’ compensation claim ... and the onset of UPS’s retaliatory conduct against [him].” Op. at 1197 (internal quotation marks omitted); see id. at 1197-98. But Jones filed his workers’ compensation claim by mid-November 2003, and there is no allegation of any wrongdoing by Sloan before she received Dr. Legler’s report of his February 9, 2004, examination — a temporal proximity of about three months. Our precedents suggests that this is too long a period from which to infer causation absent other evidence. See Trujillo v. PacifiCorp, 524 F.3d 1149, 1157 n. 5 (10th Cir.2008) (collecting cases). The majority makes no attempt to distinguish those precedents; although it sets forth evidence that Sloan engaged in misconduct, it does not explain how that misconduct suggests that the motive for the misconduct was retaliation for filing the workers’ compensation claim.
Still, out of great deference to the jury, I can accept the verdict on liability. But that is as far as deference can take me. It is one thing to say that the jury, based upon all the evidence at trial, could infer— under a preponderance-of-the-evidence *1210 standard — that Sloan was acting in retaliation for Jones’s having filed a compensation claim. It is quite another to say that the jury could infer — under a clear-andconvineing standard — not only that Jones was retaliating but also that Lewick (1) knew that Sloan had engaged in misconduct, (2) knew that Sloan’s motive was retaliation for the workers’ compensation claim, and (3) approved of and ratified both the misconduct and the motive.
The evidence relied on by the majority opinion is inadequate to support the necessary inference. As labor manager for UPS, Lewick handled 35 to 50 grievances per week. Jones’s first grievance contended that he should be returned to work because both his personal physician and a UPS physician, Dr. Legler, had released him to return to work. Dr. Legler, however, had amended the release and imposed permanent restrictions. Under the collective-bargaining agreement (CBA) between UPS and the Teamsters Union, the parties are to agree on a third doctor to perform an examination when the personal physician and the UPS physician disagree. The arbitration panel provided by the CBA heard Jones’s grievance and adopted Lewick’s position, ordering the parties to enter the third-doctor procedure. Lewick and the Union representative both struck names from a list of doctors, ultimately selecting Dr. Buck. Lewick testified that once the doctor is selected, UPS is to arrange an appointment for the employee to see the doctor, but is not to communicate anything about what the doctor is supposed to do. Up to the time of Dr. Buck’s examination of Jones, there is no evidence that Lewick knew of any wrongdoing by Sloan, so he could hardly have ratified it.
After Dr. Buck issued his report, Jones filed another grievance, this time complaining that UPS had improperly interfered with the third-doctor procedure by refusing to authorize Dr. Buck to order a functional-capacity examination (FCE). When Lewick received the grievance, he contacted Sloan because he was concerned about the failure to approve an FCE. He testified that Sloan told him that she had simply informed Dr. Buck that there had been an earlier FCE. In any event, Jones’s second grievance was upheld by the arbitration panel, and a second third-doctor exam was ordered. The selection of Dr. Buck to conduct the second examination was not preordained. According to Lewiek’s testimony, the parties did not strike names from a list on the second go-round because the Union business agent told Lewick that Jones requested Dr. Buck.
There is no evidence that Lewick authorized or ratified Sloan’s conversation with Dr. Buck by anything he said or did during the second grievance proceeding. What the majority opinion relies on for ratification is Lewick’s instruction to Sloan not to talk to Dr. Buck before he conducted his second examination of Jones, four months after the first examination. The majority’s theory is that a rational jury could infer that Lewick wanted Dr. Buck to continue to be misinformed about what he could do.
In my view, however, a rational jury could not draw that inference by clear and convincing evidence.[1] The jury was in *1211 structed that “[t]o be clear and convincing, evidence should be ‘clear’ in the sense that it is certain, plain to the understanding, and unambiguous, and ‘convincing’ in the sense that it is so reasonable and persuasive as to cause you to believe it.” Aplt. App., Vol. I at 136 (Doc. 145, Instruction No. 13). There is nothing “certain,” “plain to the understanding,” or “unambiguous” about the inference that Lewick wished Dr. Buck to be misinformed. To begin with, there is no evidence to contradict, or undermine in any way, Lewick’s testimony that he believed the third-doctor procedure prohibited any communication by UPS to the doctor except to set an appointment. Moreover, one would expect Jones to inform Dr. Buck of the reason for the repeated visit — Sloan’s improperly telling Dr. Buck not to order a functional evaluation. Silence by UPS would therefore mean that Dr. Buck would hear only from Jones what the purpose of the examination was and why it was ordered. Indeed, it is baffling why Jones did not so inform Dr. Buck. Perhaps one could speculate that Lewick was so clever and insightful that he predicted that Jones would not explain his visit to Dr. Buck and that Dr. Buck would not make any further inquiry. But no rational person could find that this was plainly, certainly, or unambiguously Lewick’s plan. I should add that the theory expressed in the majority opinion (that Lewick ratified Sloan’s retaliation by telling her not to contact Dr. Bush) was not raised by Jones at trial or in his appellate briefs. In sum, I would reverse the award of punitive damages.
The Kansas Statute Is Procedural
Although I believe that there was insufficient evidence to support the award of punitive damages and that it is therefore unnecessary to reach the other punitive-damages issues raised in this case, I will address one of the issues briefed by UPS because it has divided the very capable district judges in Kansas and additional analysis may be helpful. In my view, the Kansas statute that delegates to the judge, rather than the jury, the assessment of the amount of punitive damages is a procedural rule, not a substantive one, for purposes of the Erie doctrine, and therefore must yield to a contrary federal rule in federal-court trials.
In Schriro the Supreme Court considered the retroactivity of its decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which had held that in a death-penalty proceeding the existence of an aggravating factor must be proved to a jury, rather than the judge. The Court held that Ring did not apply retroactively because it was procedural (and was not a “watershed” procedural rule entitled to retroactive effect). In support, it said that under the Erie doctrine it had ruled that allocation of decisionmaking authority is a procedural matter. The Court wrote:
*1212 Ring altered the range of permissible methods for determining whether a defendant’s conduct is punishable by-death, requiring that a jury rather than the judge find the essential facts bearing on punishment. Rules that allocate decisionmaking authority in this fashion are prototypical procedural rules, a conclusion we have reached in numerous other contexts. See Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 426 [116 S.Ct. 2211, 135 L.Ed.2d 659] (1996) (Erie doctrine)....
542 U.S. at 353, 124 S.Ct. 2519 (emphasis added).
The Eñe-doctrine opinion cited by the Court — Gasperini—is a complicated one. But it is worth summarizing to show its relevance here. Gasperini was a diversity case in which the plaintiff sought damages for the loss of some photographic transparencies. The New York statute at issue empowered the New York Appellate Division “to review the size of jury verdicts and to order new trials when the jury’s award deviates materially from what would be reasonable compensation.” Gasperini 518 U.S. at 418, 116 S.Ct. 2211 (internal quotation marks omitted). The question was whether the state statute should apply in whole or in part in federal court. The Supreme Court analyzed the statute as containing two components. First, the statute set a limit on punitive-damages awards — an award could not depart too far from reasonable compensation. The Court considered this component of the law to be the functional equivalent of a statutory cap on damages, “differing] from a statutory cap principally in that the maximum amount recoverable is not set forth by statute, but rather is determined by state law.” Id. at 429, 116 S.Ct. 2211 (internal quotation marks omitted). The second component of the law assigned the task of applying that limit to the state intermediate appellate court. Thus, on the page of Gasperini cited by Schriro, the Court wrote that the New York statute:
appraised under [Eñe ] and decisions in Eñe’s path, is both ‘substantive’ and ‘procedural’: ‘substantive’ in that [the statute’s] ‘deviates materially’ standard controls how much a plaintiff can be awarded; ‘procedural’ in that [the statute] assigns decisionmaking authority to New York’s Appellate Division.... The dispositive question ... is whether federal courts can give effect to the substantive thrust of [the statute] without untoward alteration of the federal scheme for the trial and decision of civil cases.
Id. at 426, 116 S.Ct. 2211.
The Court’s holding in Gasperini was twofold: It upheld the application in federal court of the substantive component — the cap on punitive damages; but it refused to uphold the application of the procedural component — the assignment to the appellate court of determining whether the award deviated materially from reasonable compensation. Under federal law, it said, the role of the federal appellate court was limited to determining whether the district court’s decision, either to uphold the jury award or to set it aside and require a new trial (because the award deviated materially), was an abuse of discretion. See id. at 437-39, 116 S.Ct. 2211. To comply with federal procedural law, the federal district court would make the deviated-materially determination, and the circuit court would decide only whether that determination was an abuse of discretion. Thus, as noted in Schñro, Gasperini held that federal law governed the allocation of decision-making authority between the trial and appellate courts because such allocation rules are procedural. Applying Gasperini to this case, it is clear that what we have is a question of the allocation of decision-making authority — whether the court or the *1213 jury determines the amount of punitive damages — -which is a procedural matter governed by federal law. The Kansas statute does not impose a cap on punitive damages or its functional equivalent, so Gasperini’s holding on the substantive component of the New York statute is irrelevant.
UPS invokes the outcome-determination test of Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), which is generally applied to determine, for Erie purposes, whether a state law is substantive or procedural. But that test is not always the applicable one. As the Gasperini opinion reminds us, the Supreme Court decision in Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 356 U.S. 525, 537, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), “said that the Guaranty Trust ‘outcome-determination’ test was an insufficient guide in cases presenting countervailing federal interests.” Gasperini 518 U.S. at 432, 116 S.Ct. 2211. Gasperini went on to quote the following passage from Byrd as describing the countervailing interest in that case, which concerned whether the federal court sitting in diversity should follow a state-law rule requiring that the issue be tried to the court:
“The federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction. An essential characteristic of that system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury and, under the influence — if not the command — of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury.”
Id. (quoting Byrd, 356 U.S. at 537, 78 S.Ct. 893 (footnote omitted)). Byrd therefore held that, despite state law to the contrary, in federal court the issue must be tried to the jury.
I recognize that very recently Justice Scalia, writing for himself and three other members of the Court, said that in the “Erie ... context, it ma[kes] no difference whether the rule [is] technically one of substance or procedure; the touchstone [is] whether it significantly affects the result of a litigation.” Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., — U.S. -, 130 S.Ct. 1431, 1442, 176 L.Ed.2d 311 (2010) (alteration and internal quotation marks omitted). But the sentence was dictum whose purpose was only to distinguish Erie-doctrine cases from the case before the Court, which addressed the Rules Enabling Act and the applicability of a federal rule of civil procedure in a diversity case. The sentence was not intended to capture all the subtleties of the Erie doctrine; elaboration was unnecessary because the Erie doctrine was not the issue. In particular, nothing in Shady Grove involved the allocation of decision-making authority between judge and jury, so the specifics of the Erie doctrine in that context were hardly relevant. There is no reason to think that Justice Scalia’s single sentence in Shady Grove signaled the repudiation of what he had written in his Gasperini dissent, where he considered specifically the allocation of authority between judge and jury:
Outcome determination was never intended to serve as a talisman, and does not have the power to convert the most classic elements of the process of assuring that the law is observed into the substantive law itself. The right to have a jury make the findings of fact, for example, is generally thought to favor plaintiffs, and that advantage is often thought significant enough to be the basis for forum selection. But no one would argue that Erie confers a right to a jury in federal court wherever state courts would provide it; or that, were it not for the Seventh Amendment, Erie *1214 would require federal courts to dispense with the jury whenever state courts do so.
518 U.S. at 465, 116 S.Ct. 2211 (citation and internal quotation marks omitted). The majority opinion in Gasperini said nothing to the contrary.
Returning to the language in Schriro that I find controlling, I would take it seriously when that opinion states that “[rjules that allocate decisionmaking authority in this fashion [by requiring fact-finding by a jury rather than a judge] are prototypical procedural rules, a conclusion we have reached in numerous other contexts,” and then cites “Erie doctrine” as the first “other context.” 542 U.S. at 353, 124 S.Ct. 2519. Until instructed otherwise by the Supreme Court, I would read its opinions as stating that the allocation of authority between a judge and a jury in diversity cases is a matter of federal law. See 8 James Wm. Moore et al., Moore’s Federal Practice § 38.14[1] (3d ed. 2011) (“The right to a jury trial in the federal courts is to be determined as a matter of federal law in diversity as well as other actions.”); 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2303 (3d ed. 2008) (“[T]he Byrd decision establishes the proposition that federal practice controls the scope and incidence of jury trial, even when federal practice is not constitutionally required.”).

. In Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254-55, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Court held that the clear-and-convincing-evidence standard must be considered in determining whether summary judgment was appropriate. The rationale for that decision indicates that we must likewise consider that standard in determining the sufficiency of the evidence to support a jury verdict. The Court wrote:
[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden. This conclusion is *1211 mandated by the nature of this determination. The question here is whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of evidence required by the governing law or that he did not. Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say the jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.
Id. See Applied Genetics Int’l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1244 (10th Cir.1990) (summary judgment for defendants had been appropriate in part "[bjecause of the high standard of proof” — clear and convincing evidence — required for a fraud claim.)