Chief JUSTICE TOAL:
I respectfully dissent. I would find the petitioners are not entitled to resentencing pursuant to Miller v. Alabama, -U.S.-, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), because the Miller decision is retroactive only with respect to juveniles sentenced to mandatory life without parole (LWOP), and because South Carolina utilizes a non-mandatory sentencing scheme.[11]
Pursuant to Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), a court decision implicating a constitutional right applies retroactively when the holding creates a new substantive rule or is a watershed rule of criminal procedure. Talley v. State, 371 S.C. 535, 541-44, 640 S.E.2d 878, 880-82 (2007) (citing Teague, 489 U.S. at 300-01, 305, 311-12, 109 S.Ct. 1060). A rule is a new substantive rule if it prohibits a certain category of punishment for a class of defendants because of their status or offense. Id. at 543, 640 S.E.2d at 882; see also Schriro v. Summerlin, 542 U.S. 348, 352, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) (stating new substantive rules apply retroactively on collateral review because they “carry a significant risk that a defendant ... faces a punishment that the law cannot impose on him” (internal quotation marks omitted)).
As the majority acknowledges, Miller “plainly excludes a certain class of defendants — juveniles—from specific punishment — [mandatory LWOP].” See also Miller, 132 S.Ct. at 2460; People v. Davis, 379 Ill.Dec. 381, 6 N.E.3d 709, 722 *547 (Ill.2014). As such, I agree that Miller is retroactive with respect to any juvenile sentenced to mandatory LWOP.
However, I depart from the majority with respect to the scope of Miller’s retroactive application. Miller’s holding explicitly applies only where sentencing courts were “preclude[d] ... from taking account of an offender’s age and the wealth of characteristics and circumstances attendant to it,” because the courts did not “have the opportunity to consider mitigating circumstances.” Id. at 2467, 2475. Were South Carolina to employ a mandatory sentencing scheme, such as those at issue in Miller, I would not hesitate to retroactively apply the holding to any prisoner collaterally attacking his sentence.
However, South Carolina employs a discretionary sentencing scheme, in which sentencing courts consider all mitigating evidence presented by the criminal defendant. See S.C.Code Ann. §§ 16-3-20(A), -85(C). Thus, South Carolina courts already consider the hallmark features of youth.
To the extent the majority wishes to provide courts with more explicit directions to consider the Miller factors in future sentencing hearings, I do not object; however, such future direction does not change the fact that petitioners’ sentencing courts were given “the opportunity to consider mitigating circumstances.” Miller, 132 S.Ct. at 2475 (emphasis added); see also id. at 2466 (“But the mandatory penalty schemes at issue here prevent the sentencer from taking account of these central considerations [regarding youth and impetuosity]. By removing youth from the balance — by subjecting a juvenile to the same [LWOP] sentence applicable to an adult — these laws prohibit a sentencing authority from assessing whether the law’s harshest term of imprisonment proportionately punishes a juvenile offender.” (emphasis added)).
In my opinion, it is a leap of faith for the majority to extend Miller’s holding — expressly applicable only to mandatory sentencing schemes — to a discretionary sentencing scheme, and to require strict compliance with a rule that the Supreme Court has not yet set forth. The majority states that it is simply “giv[ing] effect to the proportionality rationale integral to Miller’s holding”; however, I find significant the fact that the majority cannot cite a single other jurisdiction with a discre *548 tionary sentencing scheme that has decided to apply Miller retroactively to discretionary LWOP sentences. Accordingly, I would find Miller does not apply retroactively in discretionary sentencing jurisdictions such as South Carolina.
Ironically, the majority and I agree that Miller’s holding means that juveniles may not be sentenced to mandatory LWOP because courts must consider each juvenile’s individual circumstances; however, the majority’s holding does exactly the opposite, ordering resentencing for all of the petitioners, with no individualized consideration of the adequacy of their original sentencing hearing. Even if I were to agree that Miller applies retroactively in South Carolina, we must consider whether the sentencing courts abused their discretion in sentencing each of the petitioners.[12]
Perhaps the best example from the petitioners’ sentencing hearings of how the courts exercised discretion and considered the juveniles’ individual circumstances is shown through the joint sentencing hearing of Petitioner Angelo Ham (Petitioner Ham) and his juvenile co-defendant, Dennis Hunter (Hunter). The sentencing testimony revealed that Petitioner Ham, Hunter, and Anthony Robinson (Robinson) (collectively, the defendants) jointly planned and executed an armed robbery during which Robinson murdered the victim (Victim), an elderly store manager.[13]
*549 The day before the murder, Robinson shot his live-in girlfriend, and the police issued an arrest warrant for Robinson for assault and battery with intent to kill. Needing money so that he could leave town and avoid arrest, Robinson approached Petitioner Ham and Hunter and asked them to help him plan a robbery. Petitioner Ham maintained that he participated in the planning and execution of the robbery under duress, claiming that Robinson threatened to kill him if he refused to help. However, others testified at the sentencing hearing that Petitioner Ham was the “leader of this pack” because Petitioner Ham was the one who knew Victim prior to the robbery, and because Petitioner Ham was aware of Victim’s habit of working late at the store by himself, thus making Victim a more accessible target.
Under the influence of marijuana and cocaine, the defendants drove to Victim’s store after the store had closed for the night. Hunter stayed in the car, while Petitioner Ham and Robinson approached the store. Petitioner Ham convinced Victim to open the door, and he and Robinson rushed past Victim into the store. The defendants were aware that Victim kept a gun at the store, and Robinson therefore immediately shot Victim ten times.[14]
The police arrested the defendants soon after the robbery and murder. Hunter immediately gave a videotaped statement to the police, and strongly and consistently indicated his willingness to testify against both of his co-defendants. Based on Hunter’s testimony, the State noticed Robinson with its intent to seek the death penalty against him.[15]
Petitioner Ham and Hunter pled guilty to robbery and murder. In a joint sentencing hearing, the Solicitor and Victim’s family recounted Victim’s community service and *550 moral characteristics, such as his generosity to his employees and the community as a whole.
In mitigation, Petitioner Ham’s and Hunter’s attorneys painted a colorful picture of the boys’ pasts. First and foremost, the attorneys cited the boys’ youth, specifically noting that their youth made them ineligible for the death penalty because they lacked the judgment of an adult and could not reason or make “correct decisions” like an adult could.
Petitioner Ham’s attorney stated that prior to being “waived up” to circuit court, a doctor evaluated Petitioner Ham and recommended that he remain in the juvenile system to face these charges, a recommendation which the court ultimately disregarded. The doctor noted that Petitioner Ham had a “borderline” I.Q. score and a third grade reading comprehension level.[16] Notes from Petitioner Ham’s school file indicated that Petitioner Ham was “easily influenced by others” and succumbed readily to peer pressure. Moreover, the testimony revealed that Petitioner Ham had little to no contact with his father while he was growing up, that he had an older brother who was currently in jail, and that he was “in and out” of the Department of Juvenile Justice throughout his youth. Finally, Petitioner Ham’s attorney stated that his stepfather abused him, and that Petitioner Ham witnessed numerous acts of domestic violence between his mother and stepfather.
Hunter’s background was similar, revealing that his grandmother and grandfather raised Hunter and his four younger siblings. While living with his grandparents, Hunter performed well in school and avoided trouble. However, when Hunter was fourteen, Hunter’s grandfather died, Hunter’s performance in school declined sharply, and Hunter began “hanging out with the wrong crowd.” Ultimately, Hunter dropped out of school in ninth grade. Although Hunter eventually wished to return to school, the school refused to readmit him because of his numerous behavioral problems. At age fifteen, Hunter began breaking the law, “and it was just downhill at that point.” Hunter’s grandmother, mother, *551 and sister all remained involved in his life and supported him throughout the court proceedings.
After hearing all of the relevant testimony, the court acknowledged that punishing Petitioner Ham and Hunter would not restore Victim’s life or the lives of his family members, who were distraught throughout the proceedings. The court differentiated between Hunter — who remained in the car throughout the robbery and murder and thus had no contact with Victim — and Petitioner Ham, who lured Victim to the door and was an active participant in the crimes. The court likewise noted that Hunter immediately realized the consequences of his actions and took steps to ensure that he and his co-defendants were brought to justice, whereas Petitioner Ham was merely willing to testify had Robinson’s case gone to trial.
Finally, the court gave Petitioner Ham and Hunter the opportunity to speak. Hunter chose not to address the court or Victim’s family; however, Petitioner Ham took the opportunity to inform the court that he felt his attorney was “ineffective” and that therefore his sentence “shouldn’t be carried on [sic] today” because he “d[id]n’t want him as [his] counsel [any] more.” After resolving the issue, the court asked four separate times whether there was any evidence Petitioner Ham would like to call to the court’s attention in order to aid the court in determining an appropriate sentence. Rather than expressing remorse or reiterating his attorney’s previous statements, Petitioner Ham denied his guilt in the crimes entirely, stating that “just because we was at this store at a particular time ... doesn’t mean that we actually killed anybody, we actually robbed anybody, we even committed a crime.” Petitioner Ham further accused Hunter and Robinson of lying in their confessions, and denied that the eyewitnesses’ testimony corroborated the defendants’ guilt.
The court then stated:
Mr. Hunter and Mr. Ham, one of the things judges try to look at to see what is the possibility of some type of rehabilitation. What degree of remorse might exist when it comes to making a determination in sentencing.
Mr. Hunter, from your standpoint it appears that there is a terrible crime that has been committed; that there is *552 some recognition of what you have done, your responsibility in it, and your desire to try and have judgment entered in connection with this matter and to have the consequences of your sentence, whatever that sentence might be.
Mr. Ham, on your behalf, however, it appears that there is no real sense of remorse; that having pled guilty you’re now trying to recant the testimony that you previously gave; that as to your involvement that previous statements are incorrect and you have no remorse and you have no acceptance of the responsibility in connection with this matter.
I ... find that ... you have simply refused to accept and acknowledge any responsibility in here and — today and give me any hope that there is any reason to believe that you can be rehabilitated.
The court then sentenced Petitioner Ham to LWOP for Victim’s murder; however, the court found that Hunter’s situation was “different.” The court stated that Hunter showed “some semblance that you can live long enough and/or remorseful enough that you should get the opportunity to live in society again at an advanced age.” Therefore, the court sentenced Hunter to forty years for Victim’s murder.
In considering Petitioner Ham’s sentencing hearing, I cannot see how the sentencing court abused its discretion. Rather, I applaud the sentencing court in conducting such a thorough hearing, one in which it already considered each of the five Miller factors. Accordingly, it strikes me as absurd that the majority orders resentencing for all petitioners without considering the adequacy of the original hearings.[17]
Further, and more egregiously, the majority fails to give adequate instructions to the resentencing courts regarding how to conduct the resentencing hearings. As demonstrated, supra, at least some of the original sentencing hearings were entirely compliant with Miller. For those cases, the majority *553 does not provide any further direction to the resentencing courts regarding how to conduct a new hearing, nor identifies any facts that the courts should consider on remand that were not already considered. Rather, the majority simply directs all of the resentencing courts to give “constitutional meaning” to youth and its attendant characteristics, and to “fully explore the impact of the defendant’s juvenility on the sentence rendered.” These two directives are unmistakably vague and provide little concrete guidance, thus demonstrating the adequacy of the original hearings. See Cantrell, 250 S.C. at 379, 158 S.E.2d at 191 (stating that a sentencing judge is presumed to have considered the information presented during the sentencing proceeding before imposing a punishment).[18] While the majority may disagree with the propriety of the petitioners’ sentences, the Court is not a fact finder, and must apply the relevant legal principles. It is of no use to say that the sentencing hearings were inadequate, and simultaneously fail to give specific instruction to the resentencing court on how to avoid the same mistake in the future.
In my view, the dangers present in Miller — namely, that the sentencing courts were foreclosed from considering age as a mitigating factor based on the imposition of mandatory LWOP — were simply not present in the petitioners’ cases. Specifically, when a juvenile is sentenced to LWOP by way of a discretionary sentencing scheme, the unifying principle from Roper, Graham, and Miller — that children, for purposes of imposing the most serious punishments, are constitutionally different — is not violated. See Miller, 132 S.Ct. at 2466-68, 2474-75 (“Such mandatory penalties, by their nature, preclude a sentence from taking account of an offender’s age and the wealth of characteristics and circumstances attendant to it”).
Thus, I would ultimately find Miller does not apply retroactively to discretionary LWOP sentences, and certainly does not entitle each and every petitioner to resentencing. The *554 petitioners each received a discretionary sentence, which Miller explicitly permits. See Miller, 132 S.Ct. at 2469.
CONCLUSION
For the foregoing reasons, I would find the rule announced in Miller does not apply retroactively to the petitioners herein, or any other similarly situated defendants who collaterally attack their convictions. Therefore, I would deny petitioners’ requests for resentencing.
KITTREDGE, J., concurs.

. See S.C.Code Ann. §§ 16-3-20(A), -85(C) (2003 & Supp.2010) (permitting a discretionary sentence of LWOP for murder or homicide by child abuse, but also imposing mandatory minimum terms of imprisonment for each crime).

. In its zeal to reach its desired result, the majority makes no inquiry into whether the sentencing courts abused their discretion. See State v. Dawson, 402 S.C. 160, 163, 740 S.E.2d 501, 502 (2013) ("In criminal cases, the appellate court sits to review errors of law only. A sentence will not be overturned absent an abuse of discretion when the ruling is based on an error of law.” (emphasis added) (citations omitted)); see also State v. Cantrell, 250 S.C. 376, 379, 158 S.E.2d 189, 191 (1967) (stating a judge is given broad discretion during sentencing proceedings and it is presumed that he or she has considered the information presented during the sentencing proceeding before imposing a punishment).

. At the time of the crime, Petitioner Ham was fifteen years old, Hunter was seventeen years old, and Robinson was nineteen years old. Neither Hunter nor Robinson is a petitioner here because the court did not sentence Hunter to LWOP, and because Robinson was an adult when he committed the crimes and is thus unaffected by Miller's holding.

. Victim's body exhibited defensive wounds, indicating that he did not die immediately.

. Petitioner Ham likewise agreed to give a videotaped statement admitting his guilt in the robbery and murder; however, he was more apprehensive about testifying against Robinson because the two were incarcerated in the same facility, and he was concerned that Robinson would retaliate against him if he chose to testify. Ultimately, Robinson entered a guilty plea in exchange for receiving a LWOP sentence. After Robinson pled guilty, Petitioner Ham stated that he would have testified against Robinson had the matter gone to trial.

. The court later spoke to Petitioner Ham and found that, to the extent he suffered from a limited I.Q., he was nonetheless fully able to rationalize, think, and communicate.

. To be sure, unlike Petitioner Ham’s sentencing hearing, and given the limited records before us, some of the petitioners’ hearings could be viewed as less than exemplary; however, again, we must make such a determination on an individual basis, considering the specific circumstances of each hearing, and determining whether sentencing the petitioner to LWOP in that particular case was an abuse of the sentencing court’s discretion.

. For similar reasons, I find the majority’s statement that the “absence of this level of inquiry into the characteristics of youth produced a facially unconstitutional sentence” unhelpful to the resentencing courts. (Emphasis added). The majority disavows requiring a sentencing hearing which mirrors the penalty phase of a capital case, but to the extent Petitioner Ham’s hearing does not comply with Miller, I am at a loss as to what — besides a penalty-phase-like hearing — would suffice.