# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 13, 2004

## STATE OF TENNESSEE v. EARICE ROBERTS

### Direct Appeal from the Criminal Court for Shelby County
#### No. 02-03222    Chris Craft, Judge

_____

### No. W2003-02668-CCA-R3-CD  - Filed November 23, 2004

_____

The defendant, Earice Roberts, was convicted by a Shelby County Criminal Court jury of simple possession of marijuana, a Class A misdemeanor; possession of heroin with the intent to sell, a Class B felony; possession of heroin with the intent to deliver, a Class B felony; and two counts of assault, a Class A misdemeanor. After merging the possession of heroin with intent to sell conviction with the possession of heroin with the intent to deliver conviction, the trial court sentenced the defendant as a Range I, standard offender to twelve years for possession of heroin with the intent to deliver; eleven months, twenty-nine days for possession of marijuana; and eleven months, twenty-nine days for each assault. The trial court ordered that the marijuana sentence be served concurrently to the heroin sentence, but that the sentences for assault be served consecutively to each other and consecutively to the twelve-year sentence for possession of heroin, for a total effective sentence of thirteen years, eleven months, and twenty-nine days in the Department of Correction. The sole issue the defendant raised on appeal was whether the trial court erred in admitting the heroin into evidence because of the State's alleged failure to establish a proper chain of custody. However, while the case was still pending, the defendant filed a motion requesting that we consider an additional issue on appeal; namely, the impact of the United States Supreme Court's recently released Blakely v. Washington, 542 U.S. ___,124 S. Ct. 2531 (2004), opinion on the enhanced heroin sentence imposed as well as on the consecutive sentencing ordered in the case. Following our review, we conclude that the trial court did not err in admitting the heroin into evidence; that three of the four enhancement factors were inappropriately applied under Blakely, but that the remaining applicable enhancement factor, to which the trial court assigned heavy weight, justifies an enhanced sentence of ten years, six months; and that Blakely does not affect the trial court's imposition of consecutive sentencing. Accordingly, we modify the defendant's sentence for possession of heroin with the intent to deliver from twelve years to ten years, six months, but in all other respects affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed as Modified

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Robert Wilson Jones, Shelby County Public Defender, and W. Mark Ward, Assistant Shelby County Public Defender, for the appellant, Earice Roberts.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Steve Jones and Dean Decandia, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

Viewed in the light most favorable to the State, the evidence established that between 7:30 and 8:00 a.m. on July 20, 2001, Memphis Police Officers Kittrel Robinson and Therman Richardson were patrolling undercover in an unmarked unit in the 2200 block of Eldridge Street, an area commonly known as "the dope track," when they were flagged down by the defendant. Robinson indicated he wanted to buy marijuana, and the defendant handed Richardson two plastic bags of marijuana through the open passenger window. However, before the officers could give him the $10 payment, the defendant took off running, apparently having been alerted that something was amiss when Robinson cracked his car door open upon receipt of the drug. Both officers pursued on foot, identifying themselves as police officers and calling out to the defendant to stop, before tackling him in the driveway of a house thirty to forty feet away. There, the officers struggled with the defendant for five to seven minutes, incurring scrapes and bruises in the process, before backup officers arrived and they were finally able to handcuff him. Another bag of marijuana; $222 in cash, including two one dollar bills folded up with a white powder; and several aluminum foil packages containing a white powdery substance were found in the defendant's pockets after his arrest.

Officer Robinson testified he and his partner took the drugs seized from the defendant to the secure property and evidence room in the basement of the jail, where the drugs were field-tested, sealed in plastic bags, placed in a brown evidence envelope, labeled, and assigned a property receipt number. After referring to the arrest ticket, he testified the drugs were assigned the number "010701183." Robinson identified the evidence envelope in which the drugs had been placed, and testified for the record that both ends of the envelope were sealed when he examined it in court. On cross-examination, he testified he was present when the property room personnel opened each aluminum packet to determine if all contained the same substance and when a field test was performed on the contents of one of the aluminum packets. He said all of the packets appeared to contain the same white powder and that the powder turned blue upon testing, which indicated it was positive for cocaine. On redirect, he testified that the field test performed was known by the name "Scott," but that he was not a chemist, was unfamiliar with the drugs used in the testing process, and knew only from what he had been told that a color change to blue indicated the presence of cocaine.

Officer Therman Richardson testified he witnessed the "Scott test" performed on the white powdery substance and confirmed that the color changed to blue, which indicated a positive for cocaine. Richardson acknowledged, however, that neither he nor the individual who performed the

test was a chemist. He identified his handwriting on the property receipt form and explained the procedure he followed in submitting the evidence:

> Q. Okay. After that, you said you tagged the evidence. Tell the jury what tagging the evidence means. How do you do it?
>
> A. Just merely -- there's a plastic bag that the actual drugs goes [sic] into and the person that tested it, they will sign their name and IBM Number to it. Me, after witness it being positive, I will sign my name and IBM to it. It is then placed inside a yellow property and evidence receipt. On that particular day, I did fill out and -- the appropriate box that went with this particular case. And it's left there at the property and evidence room assigned a number.

Richardson testified he witnessed the drugs being placed in the yellow evidence envelope. He identified the envelope in court by his handwriting and by the identification number assigned to the case.

Memphis Police Officer Laquita Jones, who said she was assigned to the Vice Narcotics Unit, testified that her duties included transporting drugs from the property and evidence room to the Tennessee Bureau of Investigation ("TBI") laboratory for testing and back to the evidence room upon completion of the testing process. She described the procedure she followed when picking up drugs for transport to the TBI laboratory:

> Q. How do you insure that the drugs you take out of the property room are the drugs you're supposed to take over to TBI?
>
> A Well, it's all -- TBI requires me on the packaging, I have to put it in a plastic bag to take to TBI. I am supposed to describe whatever substance I think it may be that I'm bringing to them. It has to be on the outside of the package, and I also have to write it down in a form and let them know what I think it may be. That it is a substance, but I have to let them know that I'm bringing them something. What color it is. What shape or form it may be. So they won't just get a blank bag and not know what's going on. They could get a bag that's empty. I have to look at the substance to make sure that I am actually taking them something.

Jones stated that her procedure involved taking the drugs out of the yellow or gold evidence envelope, but leaving them sealed inside the clear plastic bag. She said that if the drugs in the plastic bag were wrapped or inside a container, she would partially open one of the containers to insure that it contained a substance and to briefly describe its appearance. She made it clear, however, that her

unwrapping or opening of any container holding the drugs occurred through the sealed plastic bag:

> Q.   And when you look at the substance, do you actually open it up and touch it?
>
> A.   I -- it's sealed in a plastic bag. I take it out of the envelope. I do not open the plastic bag. I look at it through the plastic baggy. If it's wrapped or contained in something, again, I don't open the plastic bag. I kind of open whatever container it is, and I will open only one of them to make sure that it's a substance in there and briefly describe on the packaging what I assume it to be.

Jones went on to detail the next steps in her procedure:

> Q.   Okay. So you've got suspected drugs that are sealed in an -- a plastic envelope -- And those plastic -- that plastic envelope -- are those plastic envelopes and that drug sealed inside them are contained in a –
>
> A.   Gold envelope.
>
> Q.   A gold envelope. And then you take that gold envelope and the contents of that gold envelope after you have examined them and put them in a separate envelope?
>
> A.   Yeah. I put them in a separate plastic bag and seal that bag.
>
> Q.   Is that bag colored or is it clear?
>
> A.   It's a clear bag. It's clear and on one side it's going to have a little square shape that says, right side. For the most part, it's clear.
>
> Q.   And how do you seal it?
>
> A.   I take it -- first of all, I have to write, like I said, a brief description of whatever the substance is that's contained in the envelope. I take evidence tape and it's already sealed at the bottom. It's open at the top. I take evidence tape and I fold it over on all sides where you can't get into it, and I write my initials on it saying that I sealed this bag. I did it. And I'm transporting it to the TBI.

Jones stated that the TBI laboratory staff acknowledged taking possession of evidence from her by returning a signed or initialed receipt upon her transfer to them of the sealed evidence envelopes.

Jones testified she followed the same procedure outlined above with the evidence in this case, which she identified in court by her signature and the date and time she had written across the bar code on the back of the yellow envelope. She, additionally, identified her initials on the outside of the two plastic bags within the yellow evidence envelope and testified she had described the contents of the first bag as follows: "Number 1, plastic bag containing a baggy with several pieces of yellowish rock like substances suspected to be crack cocaine. All individually wrapped in foil." Jones affirmed, however, that she never opened either of the two sealed plastic bags containing the suspected drugs and said her written description was based only on her estimation of what the contents might be. She testified on cross-examination that she had torn "a little piece" of the aluminum foil on one of the packets in order to see the contents, which appeared to her to be either "yellowish" or "light brownish." Her description of the contents as "rock like" was based on what she could feel of the drug through the aluminum foil packaging.

TBI Special Agent Forensic Scientist Dana Rose, who was accepted by the court as an expert in forensic science, testified that when a case is brought into the TBI laboratory for testing, the evidence envelope is first checked to insure it has arrived in a sealed condition; the case information is then entered into the TBI computer, which generates a unique laboratory number that is recorded on the packaging; and finally, a chemist is assigned to work the case. She said the chemist receives the evidence from the forensic technician, who, in turn, retrieves it from the vault.

Rose testified that she must obtain positive results from at least two tests, a color change test, sometimes known as a "field test kit," and an instrumental analysis, before concluding that a substance has tested positive for a scheduled drug. She stated that the instrumental analysis is the more reliable of the two, as the color change test is merely a "presumptive test," meaning that substances besides the one for which the test was designed can yield a positive result. She explained that the purpose of the presumptive test is to indicate which direction to take for further testing of the drug, as in which instrumental analysis to use. She was unaware of a "Scott" field test, but was familiar with a field test in which the chemicals turn blue to indicate a positive for cocaine, known as the "Cobalt Thiocyanate test." Rose testified that heroin would result in a blue color change or positive result in a Cobalt Thiocyanate test because "[c]obalt will turn blue in any substance that is in the hydrochloride form and cocaine is in the hydrochloride form and so is heroin."

Rose identified the evidence envelope in which the drugs in this case arrived to her for testing by several different identifying characteristics, including: the laboratory number; the defendant's name; the date the evidence was brought into the laboratory; the name of the person who brought the evidence into the laboratory; and the seal, containing her initials and the date she had worked the case, which she had placed across the bottom of the envelope upon completion of her work. The envelope was sealed when she received it, and she removed the drugs by opening it from the opposite end from the one at which the officer had placed his or her seal. When her work was completed, she replaced the drugs, sealed the end she had opened, and returned the envelope to the evidence vault.

Rose testified that her laboratory tests revealed that the sample she labeled as exhibit one, which she referred to the official laboratory report as a "[t]an powder," consisted of 0.6 grams of heroin, and that the second sample, referred to as "plant material," consisted of 4.8 grams of marijuana. Because she worked only one case at a time, there was no possibility of cross-contamination from another case. On cross-examination, she testified that tan, to her, was any color ranging from off-white to light brown and included "yellowish."

At the conclusion of Rose's testimony, the defendant moved to strike the drug evidence for failure to establish a proper chain of custody, based on the conflicting testimony about the nature and characteristics of the substance contained in the foil packets. The trial court overruled the motion, finding that the chain of custody was sufficiently established through the testimony of the various individuals in the chain:

> Well, what I have proof of is that the officers who recovered the substances from the defendant took them to the property room and sealed them. And then I have a witness who picked up the property still sealed, took it to the TBI Lab. The TBI Lab person testified that the property was sealed. They opened it and tested it, sealed it back. There was a witness that said they received it in a sealed condition and brought it back to the property room sealed. And then it was sealed when it was brought into court and unsealed here. So I don't see any proof of possibility of tampering.
>
> Now, we have not opened these exhibits to look at the color of the powder in the aluminum foil. And I'm sure if that argument is going to be made by the Defense, at some point that's going to be done. But as of right now, I can't see that the chain of custody hasn't been shown.

The State's final witness was Alnita Campbell, the supervisor of the Property and Evidence Division of the Memphis Police Department, who testified her records showed the following property tagged on July 20, 2001, under "Number 010701183": "2.6 grams total gross weight of crack cocaine, 8 grams total gross weight of marijuana," and $222 in cash. She said gross weight included the weight of the drugs and the packaging, and a substance's having been tagged as "crack cocaine" meant only that it had tested positive for cocaine by turning blue in the "Scott test."

The defendant elected not to testify and presented no evidence in his defense.

At the September 22 and September 26, 2003, sentencing hearing, Memphis Police Officer Christopher Moffatt testified he participated in a January 14, 2001, undercover drug operation in which the defendant fled from police, fought when captured, and required two applications of chemical agent and the efforts of five or six officers to subdue. He said that as a result of that

incident, the defendant was charged with possession of a controlled substance with the intent to sell or deliver, evading arrest, and resisting official detention.

Temika Gipson testified she was an employee of the Shelby County Criminal Court Clerk's office and a keeper of the official court records. According to the records she had brought with her to court, the defendant pled guilty in Case No. W0100094 to unlawful possession of marijuana with the intent to sell, a Class E felony, received a one-year sentence, and was released on determinant status on April 19, 2001.[1] Her records further reflected that an order revoking the defendant's suspension of sentence was signed on September 24, 2001. Gipson testified that the defendant also pled guilty in Case No. 93-08774 to aggravated robbery, a Class B felony, for which he received an eight-year sentence.

The defendant testified he had made a mistake as a young man that led to his eight-year sentence for aggravated robbery, but had served his time and "did the best that [he] could . . . trying to fend for [himself]" when he was released from prison. However, despite his best efforts, potential employers would not hire him because of his criminal record, and he was unable to secure anything but temporary employment. The defendant said he attempted to attend college and offered his probation officer copies of his transcripts to prove he was in school, but was hindered from continuing his education by the proceedings in the instant case. No one had offered him any rehabilitation, his efforts to succeed on his own had failed, and he had been forced to sell drugs in order to support himself. The defendant testified he had been on medications for hyperactivity and depression and had been hospitalized for those conditions in the past, but since that time had made a genuine effort to learn self-control. He stated that he wished to turn his life around and continue his education and requested that the trial court take those things in consideration and "try to help [him] out . . . to reconstruct [his] life."

On cross-examination, the defendant acknowledged he sold drugs more times than he had been caught, but denied he was a "dope dealer":

> Q   But you had to sell drugs in order to make enough money to get by?
>
> A   Not actually just sell drugs. I was not a dope dealer. I was just - - I did things to, you know, I didn't rob or steal or kill anybody. I just did things just to make, you know, tried to sustain my life, you know.
>
>      . . . .

[1] The record is not clear as to whether this conviction referred to by Ms. Gipson was based on the same incident described by Officer Moffatt. The defendant's presentence report, which was made an exhibit to the sentencing hearing and might have clarified the matter, is not included in the record before this court.

Q  Oh, I understand that.  But I mean, you've been convicted of selling drugs or possession with intent to sell drugs right after.  And you had, you know - -

A  One incident.  Excuse me.  One incident.  The first one (indiscernible) or the young lady spoke about, it was just . . . it wasn't an attempt to sell any . . . that was just the charge that they gave me.

. . . .

Q  But before that, you were arrested twice for drugs; right?

A  Right.

Q  And you were out selling it to get by; right? Because you couldn't find a job and because of your record; isn't that fair?

A  Yeah.  Well, . . . it would be unfair to say on one account.  But on - - on one count, yeah.

Q  Well, you were doing it more than you got caught?

A  Right.

The defendant acknowledged he was required to report to a probation officer in the drug case referred to by Ms. Gipson, but denied that the instant offense occurred either while he was on probation in that case or out on bond in the case described by Officer Moffatt.

At the conclusion of the hearing, the trial court applied the following four enhancement factors to the defendant's heroin conviction: (2) the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range, to which the court assigned "enormous weight"; (9) the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; (14), the felony was committed while the defendant was on release status from a prior felony conviction; and (21), the defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult. See Tenn. Code Ann. § 40-35-114(2), (9), (14), (21) (2003).  Finding no mitigating factors applicable, the trial court enhanced the defendant's heroin sentence from the presumptive eight-year minimum for his range to the maximum sentence of twelve years.

The trial court sentenced the defendant to eleven months, twenty-nine days on the marijuana conviction and on each of the assault convictions.  The court ordered that the marijuana sentence be served concurrently to the heroin sentence, but that the assault sentences be served consecutively to

each other and consecutively to the heroin sentence. Pursuant to Tennessee Code Annotated section 40-35-115, the trial court supported the imposition of consecutive sentencing with the following findings:

> As to consecutive sentencing, I find that he is a professional criminal who's knowingly devoted his life to criminal acts as a major source of livelihood, that he's an offender whose record of criminal activity is extensive. I also find that running - - particularly testimony of the officer at the last part of the sentencing hearing, that he resisted arrest there. It appears that [the defendant] when caught, will fight with police officers.
>
> And . . . and I find, therefore, that as to the misdemeanors, the assaults, his behavior - - he's a dangerous offender and his behavior indicates little or no regard to human life and no hesitation about committing a crime in which the risk to human life is high. He just will not care. He will do whatever he can to stop being caught.
>
> As to the assaults, I found that the circumstances surrounding the commission of the offense are aggravated. The testimony of the police officers, they basically had to pile on him. He just kept struggling for a long period of time. I think confinement for an extended period of time is necessary to protect society from this man, from his unwillingness pursuant to statute to lead a productive life and in his resort to criminal activity and furtherance of an antisocietal lifestyle and also that the aggregate length of the sentences I will impose reasonably relates to his offense. We can't allow him to continue to sell drugs, commit crimes and then attack the officers that arrest him with impunity.

See Tenn. Code Ann. § 40-35-115(b)(1), (2), (4) (2003); State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995).

## ANALYSIS

### I. Admission of Heroin Evidence

The defendant contends that the trial court abused its discretion "in refusing to strike the testimony concerning the testing of the suspected heroin when the State failed to satisfy the 'chain of evidence' requirement for admissibility of such evidence." In support, he cites the various discrepancies in the description of the drugs provided by the arresting officers, the officer who transported the drugs to the TBI, and the TBI agent who performed the testing. The State responds by arguing that the defendant has waived the issue of whether the chain of custody was properly

established by failing to include it as an issue in his motion for a new trial. The State further argues that, even if not waived, the trial court properly found that the chain of custody was sufficiently established based on the evidence introduced at trial.

The defendant's motion for a new trial includes the following as ground three: "The Court erred in not granting the defendant's motion to strike testimony for failure to prove chain of custody." Furthermore, the trial court specifically addressed the chain of custody issue in its ruling on the motion, stating, "And as far as not granting the defendant's motion to strike the testimony for failure to prove chain of custody, I found at the time that the evidence was properly admissible." We conclude, therefore, that the chain of custody issue was sufficiently preserved for appeal and is properly before this court.

In order for tangible evidence to be introduced at trial, the State must either introduce a witness who is able to identify the evidence or establish an unbroken chain of custody. State v. Goodman, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982). The purpose of the chain of custody is to "demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993).

> The concept of a "chain" of custody recognizes that real evidence may be handled by more than one person between the time it is obtained and the time it is either introduced into evidence or subjected to scientific analysis. Obviously, any of these persons might have the opportunity to tamper with, confuse, misplace, damage, substitute, lose and replace, or otherwise alter the evidence or to observe another doing so. Each person who has custody or control of the evidence during this time is a "link" in the chain of custody. Generally, testimony from each link is needed to verify the authenticity of the evidence and to show that it is what it purports to be. Each link in the chain testifies about when, where, and how possession or control of the evidence was obtained; its condition upon receipt; where the item was kept; how it was safeguarded, if at all; any changes in its condition during possession; and when, where and how it left the witness's possession.

Neil P. Cohen et al., Tennessee Law of Evidence § 9.01[13][c] (4th ed. 2000) (footnotes omitted). Whether or not the required chain of custody has been sufficiently established lies within the sound discretion of the trial court, and the trial court's determination will not be reversed on appeal absent a clear showing of abuse of discretion. State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987).

We find no abuse of discretion by the trial court in this matter. As the trial court noted in its ruling, the State introduced testimony from the arresting officers who seized the drugs from the defendant, the officer who transported the drugs to the TBI laboratory and back to the evidence

room, and the TBI agent who tested the drugs. Each individual described in detail the procedure used for identifying, packaging, and securing the evidence. None of these witnesses testified to having tampered with the evidence, having witnessed anyone else tampering with it, or of having received the evidence in a condition that would indicate tampering.

The defendant makes much of the differing descriptions of the drug as a "white powder," "yellowish rock like substance[] suspected to be crack cocaine," and "tan powder," arguing that in light of these discrepancies, the State should have been required to call "all of the people who handled the evidence and someone should have provided testimony concerning how the evidence was safeguarded and protected." However, the State is not required to establish facts that exclude any possibility of tampering; reasonable, rather than absolute, assurance as to the identity and integrity of the evidence is all that is required. State v. Scott, 33 S.W.3d 746, 760 (Tenn. 2000) (citations omitted). In our view, the differences were adequately explained by Officer Jones's testimony with respect to the limited manner in which she examined the evidence before writing her description, Agent Rose's testimony about the presumptive nature of the Cobalt Thiocyanate test and the fact that heroin would yield a positive result, and the natural tendencies of individuals to see or describe the same color in different terms. We conclude, therefore, that the circumstances establish with reasonable assurance the identity and integrity of the evidence at issue in this case.

## II. Sentencing

The defendant contends the United States Supreme Court's recent Blakely v. Washington, 542 U.S. ___, 124 S. Ct. 2531 (2004), opinion invalidates the trial court's application of enhancement factors to increase his heroin sentence from the presumptive eight-year minimum in the range, as well as its finding of the Tennessee Code Annotated section 40-35-115 factors upon which it relied to order consecutive sentencing for his assault convictions. The State responds that the defendant has waived the issue by failing to raise it in the trial court or in his appellate brief; that the issue cannot be addressed as plain error because the Blakely Court merely clarified the rule previously announced in Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), rather than establishing a new rule of law; and, finally, that any error in the trial court's application of enhancement factors is harmless beyond a reasonable doubt because "the evidence underlying the enhancement factors [was] uncontested and overwhelming" and "a jury presented with such facts would have found them beyond a reasonable doubt in this case."

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any

statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

As a Range I offender convicted of a Class B felony, the defendant was subject to a sentence ranging from eight to twelve years. Tenn. Code Ann. § 40-35-112(a)(2) (2003). Our Sentencing Act provides that in calculating a sentence for a Class B felony, the trial court starts at the minimum in the range, enhances the sentence as appropriate based on the existence of any enhancement factors its finds applicable, and then reduces the sentence based on the existence of any applicable mitigating factors. Id. § 40-35-210(d), (e). However, the Blakely opinion calls into question the validity of the trial court's finding and application of enhancement factors to increase a defendant's sentence. In that case, the Court applied the rule in Apprendi, 530 U.S. at 490, 120 S. Ct. at 2362 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."), to conclude that a criminal defendant's Sixth Amendment right to trial by jury encompasses the right to have the jury, rather than the judge, determine the existence of any sentence enhancements other than those based on facts reflected in the jury verdict or admitted by the defendant. Blakely, 542 U.S. at __, 124 S. Ct. at 2536-38. The Court stated:

> Our precedents make clear, however, that the "statutory maximum" for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

Id., 542 U.S. at __, 124 S. Ct. at 2537 (citations omitted).

The State first contends the defendant has waived any sentencing challenge under Blakely by his failure to raise the issue in the trial court or in his appellate brief, and the issue may not be addressed as plain error because the Blakely Court made it clear it was applying the rule previously announced in Apprendi rather than pronouncing a new rule of law. However, this court has recently rejected identical arguments. In two separate opinions, State v. Charles Benson, No. M2003-02127-CCA-R3-CD, 2004 WL 2266801, at *8 (Tenn. Crim. App. Oct. 8, 2004), and State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, 2004 WL 2246196, at *19 (Tenn. Crim. App. Oct. 4, 2004), we concluded that Blakely establishes a new rule in Tennessee, recognizing that our supreme

court had previously held that Tennessee's noncapital sentencing scheme did not violate the rule announced in Apprendi:

> The state contends that Blakely merely extends the rule announced in Apprendi. However, in Graham v. State, 90 S.W.3d 687, 692 (Tenn. 2002), our supreme court held that the noncapital sentencing procedure in this state complied with Apprendi, . . . .
>
> . . . .
>
> We acknowledge that Blakely extended Apprendi's holding that, under the Sixth Amendment, a jury must find all facts used to increase a defendant's sentence beyond the statutory maximum. However, nothing in Apprendi suggested that the phrase "statutory maximum" equated to anything other than the maximum in the range. To the contrary, the United States Supreme Court stated the issue in Apprendi as "whether the 12-year sentence imposed . . . was permissible, given that it was above the 10-year maximum for the offense charged in that count." 530 U.S. at 474, 120 S. Ct. at 2354. We also note that the Supreme Court has considered the retroactive effect of the holding in Ring v. Arizona, 536 U.S. 584, 592-93, 122 S. Ct. 2428, 2435 n.1 (2002), as a new rule for capital cases even though it was based on Apprendi. See Schriro[v. Summerlin, ___ U. S. ___, ___ ,124 S. Ct. 2519, 2526-27 (2004)]. Perhaps this resulted from the fact that Ring overruled a case that had held the opposite. See Walton v. Arizona, 497 U.S. 639, 110 S. Ct. 3047 (1990). In this regard, with our own supreme court expressly approving our sentencing procedure under Apprendi, we have a difficult time faulting a defendant in Tennessee for not raising the issue before Blakely. We conclude that Blakely alters Tennessee courts' interpretation of the phrase "statutory maximum" and establishes a new rule in this state. The defendant's raising the issue while his direct appeal was still pending is proper.

Benson, 2004 WL 2266801, at *8.

As previously stated, other than a defendant's prior convictions, the only facts upon which a trial court may rely to enhance a sentence under Blakely are those which are reflected in the jury's verdict or admitted by the defendant. Id. at 2537. Of the four enhancement factors applied by the trial court, only enhancement factor (2), which the trial court based on the defendant's prior convictions and admission of criminal behavior at the sentencing hearing, was appropriately applied in this case. However, we conclude that the trial court did not err in the weight to which it assigned enhancement factor (2), or in its determination that there were no applicable mitigating factors, and

-13-

thus, that some enhancement beyond the presumptive eight year minimum sentence is justified in this case. Accordingly, we modify the defendant's heroin sentence from twelve years to ten years, six months, to be served in the Department of Correction.

The defendant further contends that Blakely invalidates the trial court's imposition of consecutive sentencing for his misdemeanor assault convictions, asserting that "[t]he court's reliance on facts not found by the jury to order consecutive sentencing violates the defendant's right to have all the facts essential to punishment determined by a jury." The State argues that Blakely has no impact on the manner of service of a sentence. In support, it cites State v. Ira Ishmael Muhammed, No. E2003-01629-CCA-R3-CD, 2004 WL 1073889 (Tenn. Crim. App. May 10, 2004), in which this court concluded that Apprendi did not limit the trial court's ability to impose consecutive sentencing, as well as two recent opinions from other jurisdictions in which appellate courts rejected the argument that either Blakely or Apprendi affected whether consecutive sentencing could be imposed based on facts found by the trial court rather than the jury. See People v. Sykes, 16 Cal. Rptr. 3d 317, 327 (Cal. Ct. App. 2004); State v. David Stephen Sour, No. 19913, 2004 WL 1728579 (Ohio Ct. App. July 30, 2004).

The defendant in Muhammed relied upon the holding in Apprendi to challenge the constitutionality of Tennessee Code Annotated section 40-35-115, under which the trial court is given the discretion to determine if consecutive sentencing is appropriate based on its finding of the existence of any one of several enumerated factors. Muhammed, 2004 WL 1073889, at **17-18. We rejected the claim, noting that several other courts had concluded that Apprendi did not affect the trial court's ability to order consecutive sentencing:

> Courts have interpreted the holding in Apprendi to allow the trial court to determine whether sentences should be served consecutively. United States v. Samuel, 296 F.3d 1169, 1175 (D.C. Cir. 2002) ("[T]he district court did not commit Apprendi error when it enhanced [the defendant's] sentence because he committed the second of his narcotics offenses while he was on release for the first."), cert. denied, 537 U.S. 1078, 123 S. Ct. 680 (2002); People v. Williamson, 747 N.E.2d 26, 34 (Ill. App. Ct. 2001) (trial court may consider "the nature and circumstances of the offense and the history and character of the defendant" in determining whether consecutive sentencing "is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record"). Accordingly, we conclude that the defendant's arguments based upon the Apprendi holding are without merit.

Id. at *18.

As the State points out, since the release of the Blakely opinion, other jurisdictions have concluded that Blakely does not affect the trial court's ability to impose consecutive sentencing, on

the basis that both Blakely and Apprendi dealt with the range of punishment imposed for a *single* offense, not whether consecutive sentencing may be applied in cases where the defendant has been duly convicted of multiple offenses.  See State v. Abdul A. Abdullah, No. A-1982-02T4, 2004 WL 2281236, at *17 (N.J. Super. Ct. App. Div. Oct. 12, 2004) ("Both Blakely and Apprendi involved a single offense.  Neither dealt with, nor are they applicable to, the determination of consecutive sentences."); People v. Vaughn, 19 Cal. Rptr. 3d 460, 462-63 (Cal. Ct. App. 2004) ("We agree that a trial court's imposition of consecutive sentences does not result in a usurpation of the jury's factfinding powers or appellant's due process rights as long as each sentence imposed is within each offense's prescribed statutory maximum."); Sykes, 2004 WL 1682060, at *8.  We find such reasoning persuasive, and conclude, likewise, that Blakely does not impact the trial court's discretion under Tennessee Code Annotated section 40-35-115 to order consecutive sentencing in a case in which a defendant has been convicted of two or more criminal offenses.

## CONCLUSION

Based on our review of the record, the parties' briefs, and applicable law, we conclude that the trial court did not err in admitting the heroin evidence at trial; that three of the four enhancement factors are inapplicable under Blakely, but that the remaining enhancement factor justifies an enhanced sentence of ten years, six months for the defendant's heroin conviction; and that Blakely does not impact the trial court's ability to order consecutive sentencing under Tennessee Code Annotated section 40-35-115.  Accordingly, we affirm the convictions and the consecutive sentencing imposed, but modify the defendant's heroin sentence to ten years, six months.

_____
ALAN E. GLENN, JUDGE