Filed 4/24/15 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| In re NORMAN WILLOVER,<br><br>on Habeas Corpus. | H040757<br>(Monterey County<br>Super. Ct. Nos. SM980198B, HC7940)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |


THE COURT:

It is ordered that the opinion filed herein on April 16, 2015, be modified in the following particulars:

1. On page 11, line 8 of footnote 5, the phrase "the parties have not discussed whether" is replaced with the phrase "petitioner also argues that," so that the sentence reads as follows:

In this case, petitioner also argues that *Miller* should be given retroactive application under California law.

2. On page 11, following the last sentence of footnote 5, the following sentence is added:

We need not reach that issue here.

There is no change in judgment.

The petition for rehearing is denied.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.


_____
MIHARA, J.


_____
MÁRQUEZ, J.

Filed 4/16/15; reposted to provide editorial information; no change to opinion text (unmodified version)
**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


|  |  |
|---|---|
| In re NORMAN WILLOVER, <br><br> on Habeas Corpus. | H040757 <br> (Monterey County <br> Super. Ct. Nos. SM980198B, HC7940) |


## I.    INTRODUCTION

In 1999, petitioner Norman Willover was convicted after jury trial of two counts of first degree murder (Pen. Code, § 187, subd. (a)),[1] attempted premeditated murder (§§ 664, 187, subd. (a)), aggravated mayhem (§ 205), and giving false information to a peace officer (§ 148.9, subd. (a)).  The jury also found true various special circumstances and firearm enhancements.  (§ 190.2, subd. (a)(3), (17) & (21); § 12022.53, subd. (d); § 12022.55.)  The trial court sentenced petitioner, who was 17 years old at the time he committed the offenses, to two consecutive terms of life without possibility of parole (LWOP) for the murders, a consecutive term of 15 years to life for the attempted premeditated murder, and two consecutive terms of 25 years to life for the allegations that he personally discharged a firearm causing great bodily injury or death.  The trial court stayed the terms for the remaining counts and enhancements.

Petitioner appealed following his convictions, and this court modified the judgment to reflect that petitioner's sentence for the attempted premeditated murder

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

was life with the possibility of parole instead of 15 years to life. (*People v. Willover* (Oct. 19, 2000, H019899) [nonpub. opn.].)

In March of 2014, petitioner filed a petition for writ of habeas corpus in this court, arguing that he is entitled to be resentenced. Petitioner contends that at his sentencing hearing in 1999, the trial court improperly presumed that LWOP was the appropriate sentence for the murders pursuant to section 190.5, subdivision (b), in violation of *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455] (*Miller*), which held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " (*Id.* at __ [132 S.Ct. 2455, 2460].) For reasons that we shall explain, we will vacate petitioner's sentence and remand the matter for resentencing.

## II.    BACKGROUND[2]

### A.    *The Underlying Offense*

In December of 1997, petitioner purchased a .22-caliber pistol in Utah after leaving a residential treatment center without authorization. Petitioner stated that he intended to use the firearm to rob and kill people and to settle scores with rival gangs. Petitioner then traveled to Monterey, where he obtained ammunition, loaded his gun, and drove around with three other young people.

After arriving at the Monterey Wharf on January 31, 1998, petitioner fired nine shots at Priya Mathews and Jennifer Aninger, who were drinking coffee and talking. Four bullets hit Mathews and two bullets hit Aninger. Aninger survived the shooting, but Mathews died at the scene. Following that shooting, petitioner and his three companions drove to Seaside in another car. Petitioner permitted the driver of the car to use his firearm to shoot and kill Frances Olivo, who was walking on the sidewalk.

---

[2] The factual and procedural background is taken from *People v. Willover, supra*, H019899.

Petitioner was subsequently convicted of two counts of first degree murder (§ 187, subd. (a)), attempted premeditated murder (§§ 664, 187, subd. (a)), aggravated mayhem (§ 205), and giving false information to a peace officer (§ 148.9, subd. (a)).  The jury found true special circumstance allegations:  multiple murders (§ 190.2, subd. (a)(3)); murder during the commission of attempted robbery (*id*., subd. (a)(17)); and drive-by shooting (*id*., subd. (a)(21)).  The jury also found true allegations that petitioner personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)) and intentionally inflicted great bodily injury or death as a result of discharging a firearm from a vehicle during the commission of a felony or attempted felony (§ 12022.55).

**B.    *Sentencing Hearing***

Prior to petitioner's sentencing hearing in 1999, the prosecution filed a statement in aggravation, in which it cited *People v. Guinn* (1994) 28 Cal.App.4th 1130 (*Guinn*) for the proposition that, pursuant to section 190.5, subdivision (b),[3] LWOP was the presumptive sentence for a special circumstance murder committed by a 16- or 17-year-old juvenile.  The prosecution further argued that there were numerous aggravating circumstances, relating to both the offense and the offender, and no circumstances in mitigation.  (See Cal. Rules of Court, former rules 421 & 423.)  The prosecution argued that petitioner had been "feign[ing] or exaggerat[ing] purported symptoms of mental illness in order to avoid being held accountable for his conduct."  The prosecution contended that there was no justification for ever allowing petitioner to be released back into society:  "If [petitioner] is granted the possibility of parole, he stands a chance of

---

[3] Section 190.5, subdivision (b) provides:  "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."

3

being released . . . at a relatively young age . . . [where] there will be new generations of innocent people who would be exposed to the calculated but random viciousness that [petitioner] will bring with him."

Petitioner filed a sentencing memorandum, in which he argued that *Guinn* had erroneously held that section 190.5, subdivision (b) requires a presumption of LWOP for 16- and 17-year-old defendants who commit special circumstance murders. Petitioner called the *Guinn* opinion "flawed" and argued that its interpretation of section 190.5, subdivision (b) was "without logical basis."

A sentencing hearing took place on April 2, 1999. At the hearing, the prosecutor argued that petitioner did not suffer from "any mental illness that impaired his ability to make moral choices" and that petitioner had not shown any remorse. The prosecutor argued that petitioner should not be given the opportunity for parole, because "based on everything we know about him, he will come back again looking for someone to kill." The prosecutor argued that *Guinn* placed on petitioner the burden of showing that an LWOP sentence was inappropriate, and that he had "failed to carry it." The prosecutor argued that even if *Guinn* was "not correct," an LWOP sentence was still appropriate.

Petitioner's trial counsel argued that petitioner did suffer "from a mental condition that reduced culpability" and that petitioner was a "grossly immature" young man who had "little or no ability to control his own aggression." Petitioner's trial counsel argued that the trial court should not impose consecutive sentences because the crimes "were committed in so close a period of time as to indicate a single period of aberrant behavior" and because petitioner "played a minor or passive role" in the second murder. Petitioner's trial counsel argued that petitioner's antisocial personality disorder was commonly seen in young males but that "most people by the time they're in their forties or they're in their fifties do not generally tend to exhibit these tendencies." Petitioner's trial counsel requested the trial court impose a sentence that would give petitioner "the opportunity to be released from custody at some time during his life if he can

4

demonstrate to the authorities . . . that he is law abiding, that he is able to control himself, and that he does not present a danger to public safety."

In announcing its sentencing decisions, the trial court first rejected petitioner's claim that he was suffering from a mental illness that significantly reduced his culpability for the crimes. The trial court noted it had read the letters submitted in support of petitioner, which all suggested "[t]hat it would be a miscarriage of justice somehow" if petitioner received an LWOP sentence. The trial court noted that "all of the doctors and the counselors involved in this case over the years" had characterized petitioner as argumentative, explosive, controlling, defiant, resistant to feedback, and a danger to society, with poor impulse control. The court described petitioner as "a textbook example and the product of poor, indifferent and inadequate parenting," noting that petitioner's mother would often "blow up, call him a loser, give him a knife and ask him to kill her." The court believed that "[c]ommon sense dictates that [petitioner] must never be allowed the possibility of drawing another breath in freedom."

The trial court ultimately sentenced petitioner to two consecutive LWOP terms for the two first-degree murders, a consecutive term of 15 years to life for the attempted premeditated murder, and two consecutive terms of 25 years to life for the allegations that he personally discharged a firearm causing great bodily injury or death. The trial court stayed the terms for the remaining counts and enhancements.

## C.    *Appeal*

Petitioner appealed his convictions to this court. On October 19, 2000, this court modified the judgment to reflect that petitioner's sentence for the attempted premeditated murder conviction was life with the possibility of parole instead of 15 years to life. This court affirmed the judgment as modified.

## D.    *Habeas Petitions*

On February 28, 2013, petitioner filed a petition for writ of habeas corpus in the trial court, alleging that his LWOP sentence violated the Eighth Amendment under

*Miller*, *supra*, 567 U.S. __ [132 S.Ct. 2455]. On January 13, 2014, the trial court denied petitioner's habeas corpus petition.

On March 10, 2014, petitioner filed the instant petition for writ of habeas corpus in this court. On October 23, 2014, this court issued an order to show cause and appointed counsel for petitioner. The Attorney General subsequently filed a written return, and petitioner thereafter filed a traverse.

On July 17, 2014, petitioner filed another habeas corpus petition in the trial court seeking resentencing, relying on *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*). According to the Attorney General, that petition remains pending.

### E.    *Petition to Recall Sentence*

On April 9, 2014, petitioner filed a petition in the trial court seeking resentencing pursuant to section 1170, subdivision (d)(2). On April 3, 2015, the trial court denied the petition.

## III.    DISCUSSION

### A.    *Miller and Gutierrez*

At the time of petitioner's 1999 sentencing hearing, section 190.5, subdivision (b) had "been construed . . . as creating a presumption in favor of life without parole as the appropriate penalty for juveniles convicted of special circumstance murder." (*Gutierrez, supra,* 58 Cal.4th at p. 1360; see *Guinn, supra,* 28 Cal.App.4th 1130.)

In 2012, the United States Supreme Court ruled that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " (*Miller, supra,* 567 U.S. at __ [132 S.Ct. 2455, 2460].) In *Miller*, the issue arose in two companion cases, both involving 14-year-old defendants, Jackson and Miller, who were convicted of murder and sentenced to LWOP. (*Ibid.*) Jackson's case arose on appeal from the dismissal of a petition for writ of habeas corpus; Miller's case arose on direct appeal. (*Id.* at __ [132 S.Ct. 2455, 2461-2463].)

6

In *Miller,* the Court explained that its prior cases had "establish[ed] that children are constitutionally different from adults for purposes of sentencing." (*Miller, supra,* 567 U.S. at __ [132 S.Ct. 2455, 2464]; see *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*) [invalidating death penalty for juvenile offenders] & *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*) [LWOP sentences for non-homicide juvenile offenders violate the Eighth Amendment].) Specifically, "juveniles have diminished culpability and greater prospects for reform," making them " 'less deserving of the most severe punishments.' " (*Miller, supra,* 567 U.S. at __ [132 S.Ct. 2455, 2464].)

The *Miller* court summarized its holding as follows: "Mandatory life without parole for a juvenile precludes consideration of his [or her] chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him [or her]—and from which he [or she] cannot usually extricate himself [or herself]—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his [or her] participation in the conduct and the way familial and peer pressures may have affected him [or her]. Indeed, it ignores that he [or she] might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his [or her] inability to deal with police officers or prosecutors (including on a plea agreement) or his [or her] incapacity to assist his [or her] own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Miller, supra,* 567 U.S. at __ [132 S.Ct. 2455, 2468].)

While *Miller* held "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," the court did not decide "that the Eighth Amendment requires a categorical bar on life without parole for juveniles . . . ." (*Miller, supra,* 567 U.S. at __ [132 S.Ct. 2455, 2469].) However, the court specified it believed that LWOP sentences for juveniles would be "uncommon" and

7

limited to " 'the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.]" (*Ibid.*)  The court specified that before such a sentence is imposed on a juvenile in a homicide case, the sentencing court must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Ibid.*, fn. omitted.)

In *Gutierrez, supra,* 58 Cal.4th 134, the California Supreme Court considered the impact of *Miller* on section 190.5, subdivision (b).  The *Gutierrez* court noted that "[f]or two decades, the Courts of Appeal ha[d] uniformly interpreted section 190.5[, subdivision ](b) as establishing a presumption in favor of life without parole for juvenile offenders who were 16 years of age or older when they committed special circumstance murder." (*Gutierrez, supra,* at p. 1369.)  The California Supreme Court effectively overturned that line of appellate precedent, concluding that "section 190.5[, subdivision ](b), properly construed, confers discretion on a trial court to sentence a 16- or 17-year-old juvenile convicted of special circumstance murder to life without parole or to 25 years to life, *with no presumption* in favor of life without parole." (*Id.* at p. 1360, italics added.)  The *Gutierrez* court further held that "consideration of the *Miller* factors" is required when a sentencing court is determining whether to impose an LWOP sentence pursuant to section 190.5, subdivision (b). (*Gutierrez, supra,* at p. 1387.)

In *Gutierrez,* in which the issue arose on direct appeal, "[b]ecause the two defendants . . . were sentenced before *Miller* in accordance with the interpretation of section 190.5[, subdivision] (b) prevailing at the time," the court remanded for resentencing. (*Gutierrez, supra,* 58 Cal.4th at p. 1361.)

## B.     The Parties' Contentions

The Attorney General contends that petitioner is not entitled to be resentenced, for several reasons.  First, the Attorney General argues that *Miller* is not retroactive, and therefore relief is not available on collateral review.  The Attorney General also originally argued that because petitioner had a pending petition for recall of his sentence pursuant to

8

section 1170, subdivision (d)(2) at the time he filed the instant habeas petition, his habeas petition was premature. Finally, the Attorney General argues that the sentencing hearing transcript shows that, in imposing the LWOP sentences, the trial court did exercise its discretion and did consider petitioner's youth and social history as required by *Miller*.

Petitioner contends that *Miller* is retroactive. Petitioner further contends that the recall petition procedure provided by section 1170, subdivision (d)(2) does not provide a substitute for the resentencing process. Third, he contends that the trial court did not consider the requisite *Miller* factors at the original sentencing hearing.

## C.  *Retroactivity of Miller*[4]

We begin by discussing whether *Miller* is retroactive—that is, whether under *Miller,* habeas relief is available in a case that is no longer pending on direct appeal.

In *Teague v. Lane* (1989) 489 U.S. 288 (*Teague*), the United States Supreme Court set forth the test for determining when a new rule of constitutional law will be applied to cases on collateral review. The *Teague* court explained that "[r]etroactivity is properly treated as a threshold question, for, once a new rule is applied to the defendant in the case announcing the rule, evenhanded justice requires that it be applied retroactively to all who are similarly situated." (*Id.* at p. 300.) According to *Teague,* "new rules should always be applied retroactively to cases on direct review, but . . . generally they should

---

[4] In *In re Alatriste* (2013) 220 Cal.App.4th 1232, review granted February 19, 2014, S214652, and *In re Bonilla* (2013) 220 Cal.App.4th 1232, review granted February 19, 2014, S214960, the California Supreme Court may consider whether *Miller* applies retroactively on habeas corpus to a prisoner who was a juvenile at the time of the commitment offense, depending on its resolution of other issues presented in those cases. (See also *In re Rainey* (2014) 224 Cal.App.4th 280, review granted June 11, 2014, S217567, briefing deferred; *In re Wilson* (2015) 233 Cal.App.4th 544, review granted April 15, 2015, S224745, briefing deferred.)

The United States Supreme Court recently granted a petition for writ of certiorari in *Montgomery v. Louisiana*, No. 14-280, which presents the question of whether *Miller* should be applied retroactively. (See *State v. Montgomery* (2014) 141 So.3d 264, cert. granted Mar. 30, 2015, *sub nom. Monterey v. Louisiana* (2015) __ U.S. __.)

9

not be applied retroactively to criminal cases on collateral review." (*Id.* at p. 303.) The Court reasoned that collateral review is not designed as a substitute for direct review and that the government has a legitimate interest in having judgments become and remain final. (*Ibid.*)

The *Teague* court articulated two exceptions to the general rule of nonretroactivity for new rules in cases on collateral review. First, a new rule should be applied retroactively if it "places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.' " (*Teague, supra,* 489 U.S. at p. 307.) Second, a new rule should be applied retroactively if it "requires the observance of 'those procedures that . . . are "implicit in the concept of ordered liberty." ' " (*Ibid.*)

In *Schriro v. Summerlin* (2004) 542 U.S. 348 (*Schriro*), the United States Supreme Court revisited *Teague*'s retroactivity analysis. The *Schriro* court defined the key distinction in the retroactivity analysis as whether the new rule is substantive or procedural.

*Schriro* held that substantive rules apply retroactively, and include those rules that (1) narrow the scope of a criminal statute by interpreting its terms or (2) alter the range of conduct or the class of persons covered by the statute and place them "beyond the State's power to punish." (*Schriro, supra,* 542 U.S. at p. 352.) Included within the second category are rules prohibiting a certain category of punishment for a class of defendants because of their status or offense. Such rules apply retroactively because they carry a " 'significant risk' " that a defendant stands convicted of " ' "an act that the law does not make criminal" ' " or "faces a punishment that the law cannot impose upon him [or her]." (*Ibid.*) The Court explained that although it had sometimes referred to rules of this type as "falling under an exception to *Teague*'s bar on retroactive application of procedural rules, . . . they are more accurately characterized as substantive rules not subject to the bar." (*Ibid.*, fn. 4.)

10

The *Schriro* court further explained that new "rules of procedure" generally do not apply retroactively because they do not produce a class of persons convicted on conduct that the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise. (*Schriro, supra,* 542 U.S. at p. 352.)  The Court found that because of the speculative connection to innocence, retroactive effect is only given to a small set of " ' "watershed rules of criminal procedure" ' " implicating the fundamental fairness and accuracy of the criminal proceeding.  (*Ibid.*)  This class of rules is extremely narrow; a watershed rule is one " 'without which the likelihood of an accurate conviction is *seriously* diminished.' " (*Ibid.*)[5]

The Attorney General contends that *Miller* announced a new procedural rule, not a new substantive rule, pointing out that the *Miller* court stated, "Our decision does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper*[*, supra,* 543 U.S. 551] [barring death penalty for defendants who were under 18 years of age at time of the offense] or *Graham*[*, supra,* 560 U.S. 48] [barring death penalty for juvenile offenders who did not commit homicide offenses].  Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." (*Miller, supra,* 567 U.S. at __ [132 S.Ct. 2455, 2471].)  Some courts in other jurisdictions have agreed with

---

[5] Subsequent to *Schriro,* the United States Supreme Court further clarified the application of the *Teague* retroactivity test, holding that "the *Teague* decision limits the kinds of constitutional violations that will entitle an individual to relief on federal habeas, but does not in any way limit the authority of a state court, when reviewing its own state criminal convictions, to provide a remedy for a violation that is deemed 'nonretroactive' under *Teague*." (*Danforth v. Minnesota* (2008) 552 U.S. 264, 282.)  Thus, state courts are " 'free to give greater retroactive impact to a decision than the federal courts choose to give.' [Citations.]" (*In re Gomez* (2009) 45 Cal.4th 650, 655, fn. 3.)  In this case, the parties have not discussed whether *Miller* should be given retroactive application under California law.

11

this reasoning and held that *Miller* is not retroactive to cases on collateral review. (See, e.g., *People v. Carp* (Mich. 2014) 852 N.W.2d 801, 825 (*Carp*); *Chambers v. State* (Minn. 2013) 831 N.W.2d 311, 328; *State v. Tate* (La. 2013) 130 So.3d 829, 836-837 (*Tate*); *In re Morgan* (11th Cir. 2013) 713 F.3d 1365, 1367-1368.)

Defendant points out that other courts have found *Miller* to be retroactive. (See *In re Williams* (D.C. Cir. 2014) 759 F.3d 66, 71-72; *Evans-García v. United States* (1st Cir. 2014) 744 F.3d 235, 238-240; *Johnson v. United States* (8th Cir. 2013) 720 F.3d 720, 720-721; *In re Pendleton* (3d Cir. 2013) 732 F.3d 280, 282-283 [prima facie showing]; *People v. Davis* (Ill. 2014) 6 N.E.3d 709, 722 (*Davis*); *Diatchenko v. District Attorney for Suffolk Dist.* (Mass. 2013) 1 N.E.3d 270, 281; *State v. Mantich* (Neb. 2014) 842 N.W.2d 716, 731 (*Mantich*).) Those cases have generally observed that " '[f]rom a broad perspective, *Miller* does mandate a new procedure,' " i.e., the determination of certain factors before a juvenile can be subjected to an LWOP sentence, but that for all practical purposes, "*Miller* places a particular class of persons covered by the statute— juveniles—constitutionally beyond the State's power to punish with a particular category of punishment—*mandatory* sentences of natural life without parole. [Citations.]" (*Davis, supra,* at p. 722, quoting *State v. Ragland* (Iowa 2013) 836 N.W.2d 107, 115 (*Ragland*); see also *Mantich, supra,* at p. 730, fn. omitted ["*Miller* 'amounts to something close to a de facto substantive holding' "].) Such cases have also noted that "the cases used by the Court in *Miller* to support its holding have been applied retroactively on both direct and collateral review" and reasoned, "If a substantial portion of the authority used in *Miller* has been applied retroactively, *Miller* should logically receive the same treatment." (*Ragland, supra,* at p. 116.)

Other courts considering *Miller's* retroactivity have also divided on the significance of the fact that in the *Miller* companion case, *Jackson v. Hobbs,* which arose on state collateral review (see *Miller, supra,* 567 U.S. at __ [132 S.Ct. 2455, 2465]), the Supreme Court did not distinguish the case from *Miller* itself, and vacated Jackson's

12

sentence along with Miller's sentence (*id*. at __ [132 S.Ct. 2455, 2475]). Some courts have declined to hold that the Supreme Court's disposition of the *Jackson* case indicates that *Miller* is retroactive to all cases on collateral review on the basis that "the question whether *Miller* should be applied retroactively was never presented to the United States Supreme Court." (*Carp, supra,* 852 N.W.2d at p. 830, fn. omitted; see also *Tate, supra,* 130 So.3d at p. 833, fn. 1.) Other courts have held that by granting relief to Jackson rather than distinguishing his case from Miller's on the basis that it arose on collateral review, the Supreme Court signaled that *Miller* should be retroactively applied. (See *Mantich, supra,* 842 N.W.2d at p. 731, fn. omitted [noting that *Miller* "specifically adopted this policy in order to ensure that justice is administered evenhandedly" and that it would be incongruous "to refuse to apply the rule announced in *Miller* to a defendant before us on collateral review when the Court has already applied the rule to a defendant before it on collateral review"]; *Davis, supra,* 6 N.E.3d at p. 722.)

We agree with the courts that have found *Miller* to be a new substantive rule rather than a new procedural rule, and we therefore conclude that *Miller* may retroactively be applied to cases on collateral review, such as petitioner's case. The *Miller* case effectively "alter[ed] the range of conduct or the class of persons that the law punishes" (*Schriro, supra,* 542 U.S. at p. 353), in that it barred LWOP sentences for juvenile homicide offenders unless the sentencing court determines, after a consideration of a number of case-specific substantive factors, that the defendant is " 'the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.]" (*Miller, supra,* 567 U.S. at __ [132 S.Ct. 2455, 2469].) *Miller* did not simply set forth a new rule regulating "the *manner of determining* the defendant's culpability," but a rule that sets forth the specific considerations to be made during a sentencing decision. (*Schriro, supra,* 542 U.S. at p. 353.) Because petitioner was sentenced at a time when the prevailing case law required a presumption of LWOP, there is a " 'significant risk' " that petitioner "faces a punishment that the law cannot impose upon him." (*Id.* at p. 352.)

13

We also agree with the courts finding it significant that *Miller* granted relief in the companion case, *Jackson v. Hobbs,* which arose on collateral review. While the Supreme Court did not analyze the issue, it did direct that the defendant in *Jackson* be given a new sentencing hearing. (See *Miller, supra,* 567 U.S. at __ [132 S.Ct. 2455, 2475].) "There would have been no reason for the Court to direct such an outcome if it did not view the *Miller* rule as applying retroactively to cases on collateral review." (*Ragland, supra,* 836 N.W.2d at p. 116.) And, as another out-of-state court noted, it would be incongruous "to refuse to apply the rule announced in *Miller* to a defendant before us on collateral review when the Court has already applied the rule to a defendant before it on collateral review." (*Mantich, supra,* 842 N.W.2d at p. 731; see also *Falcon v. State* (Fla. 2015) __ So.3d __, __ [2015 Lexis 534, *19-20] ["The patent unfairness of depriving indistinguishable juvenile offenders of their liberty for the rest of their lives, based solely on when their cases were decided, weighs heavily in favor of applying the Supreme Court's decision in *Miller* retroactively."].)

In sum, based on our careful review of *Miller, Gutierrez,* and cases from other jurisdictions, and after consideration of the principles set forth in those cases with respect to LWOP sentencing for juvenile offenders, we conclude that *Miller's* new rules concerning the imposition of LWOP sentences on juvenile homicide offenders are retroactive. We thus conclude that the *Miller* sentencing rules should apply to petitioner.

**D.     *Effect of Petition for Recall of Sentence***

We next turn to the question of whether the recall petition procedure provided by section 1170, subdivision (d)(2) provides a substitute for the resentencing process mandated by *Miller.*

Section 1170, subdivision (d)(2), enacted in 2012 (Stats. 2012, ch. 828, § 1) provides a procedural mechanism for resentencing to defendants who were under the age of 18 at the time of the commission of their offenses and who were given LWOP sentences. If the defendant has served at least 15 years of the LWOP sentence, he or she

14

may "submit to the sentencing court a petition for recall and resentencing" (§ 1170, subd. (d)(2)(A)(i)), so long as the LWOP sentence was not imposed for an offense in which the defendant tortured the victim or an offense in which the victim was a public safety official (*id.*, subd. (d)(2)(A)(ii)).

In the petition, the defendant must describe "his or her remorse and work towards rehabilitation." (§ 1170, subd. (d)(2)(B).) The trial court "shall hold a hearing to consider whether to recall the sentence and commitment previously ordered and to resentence the defendant in the same manner as if the defendant had not previously been sentenced" if it "finds by a preponderance of the evidence that the statements in the petition are true." (*Id.*, subd. (d)(2)(E).) The statute enumerates a number of relevant factors that the trial court may consider in determining whether to grant a petition for resentencing. (*Id.*, subd. (d)(2)(F).)[6]

---

[6] The factors "include, but are not limited to, the following: [¶] (i) The defendant was convicted pursuant to felony murder or aiding and abetting murder provisions of law. [¶] (ii) The defendant does not have juvenile felony adjudications for assault or other felony crimes with a significant potential for personal harm to victims prior to the offense for which the sentence is being considered for recall. [¶] (iii) The defendant committed the offense with at least one adult codefendant. [¶] (iv) Prior to the offense for which the sentence is being considered for recall, the defendant had insufficient adult support or supervision and had suffered from psychological or physical trauma, or significant stress. [¶] (v) The defendant suffers from cognitive limitations due to mental illness, developmental disabilities, or other factors that did not constitute a defense, but influenced the defendant's involvement in the offense. [¶] (vi) The defendant has performed acts that tend to indicate rehabilitation or the potential for rehabilitation, including, but not limited to, availing himself or herself of rehabilitative, educational, or vocational programs, if those programs have been available at his or her classification level and facility, using self-study for self-improvement, or showing evidence of remorse. [¶] (vii) The defendant has maintained family ties or connections with others through letter writing, calls, or visits, or has eliminated contact with individuals outside of prison who are currently involved with crime. [¶] (viii) The defendant has had no disciplinary actions for violent activities in the last five years in which the defendant was determined to be the aggressor." (§ 1170, subd. (d)(2)(F).)

15

If, after a hearing, the trial court decides to resentence the defendant, the court may consider the same enumerated criteria as well as "any other criteria that the court deems relevant to its decision, so long as the court identifies them on the record, provides a statement of reasons for adopting them, and states why the defendant does or does not satisfy the criteria." (§ 1170, subd. (d)(2)(I).)

In *Gutierrez*, the court rejected the Attorney General's argument that the "potential mechanism for resentencing" provided by section 1170, subdivision (d)(2) "mean[s] that the initial sentence 'is thus no longer effectively a sentence of life without the possibility of parole.'" (*Gutierrez, supra,* 58 Cal.4th at p. 1386.) The *Gutierrez* court reasoned: "A sentence of life without parole under section 190.5[, subdivision ](b) remains *fully effective* after the enactment of section 1170[, subdivision ](d)(2). That is why section 1170[, subdivision ](d)(2) sets forth a scheme for *recalling* the sentence and *resentencing* the defendant." (*Ibid.*)

The *Gutierrez* court further rejected the Attorney General's claim that section 1170, subdivision (d)(2) "removes life without parole sentences for juvenile offenders from the ambit of *Miller*'s concerns because the statute provides a meaningful opportunity for such offenders to obtain release." (*Gutierrez, supra,* 58 Cal.4th at p. 1386.) The court held that what *Miller* required for juvenile offenders sentenced to LWOP was not a " 'meaningful opportunity to obtain release' " but a sentencing court's exercise of discretion " '*at the outset.*' " (*Ibid.*)

In this case, the Attorney General originally argued that petitioner's habeas petition was premature because the trial court could still have granted his section 1170, subdivision (d)(2) petition. The Attorney General now informs us that the trial court denied petitioner's recall petition on April 3, 2015. As *Gutierrez* held, the recall petition procedure provided by section 1170, subdivision (d)(2) does not provides a substitute for the resentencing process mandated by *Miller*.

16

*E.*     *Sentencing Record*

Finally, we consider whether in imposing the LWOP sentences, the trial court in this case exercised its discretion and considered petitioner's youth and social history, such that petitioner's sentence should not be deemed cruel and unusual under *Miller.*

The *Gutierrez* court noted that remand for resentencing is required when a trial court is unaware of the scope of its discretionary powers "unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*Gutierrez, supra,* 58 Cal.4th at p. 1391, quoting *People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8.)  The *Gutierrez* court ordered resentencing in the two cases before it because in one case the trial court had expressly referred to the *Guinn* presumption in favor of LWOP while in the other case, although the trial court did not explicitly refer to that presumption, the prosecution's sentencing memorandum did.  "Absent evidence to the contrary, we presume that the trial court knew and applied the governing law," which at the time included *Guinn's* LWOP presumption.  (*Gutierrez, supra,* at p. 1390.)

The trial court in this case sentenced petitioner in 1999, long before *Miller* was decided in 2012.  The prosecution's sentencing memorandum cited to the *Guinn* case.  Petitioner argued that *Guinn* was wrongly decided, and he supported his request for a non-LWOP sentence with letters and evidence that he suffered from a mental illness.  At the sentencing hearing the trial court did not mention *Guinn* or its presumption, but did set forth the factors it considered when imposing the LWOP sentences.  These included, primarily, features of petitioner's personality and behavior, including his explosiveness, defiance, defensiveness, and poor impulse control.  The trial court found that petitioner had learned such behaviors from his mother and that petitioner's personality problems were "the product of poor, indifferent and inadequate parenting." *Miller* indicates that factors such as impetuosity are often attributable to youth, and that a dysfunctional home environment can mitigate a juvenile's culpability, weighing against punishing a juvenile

17

offender with LWOP. (*Miller, supra,* 567 U.S. at __ [132 S.Ct. 2455, 2468.) However, the trial court in this case appears to have considered these factors as weighing in favor of imposing an LWOP sentence. As such, the sentencing transcript does not clearly reflect that, as required by *Miller,* the trial court took "into account how children are different" from adults, and how juveniles have "greater prospects for reform." (*Id.* at __ [132 S.Ct. 2455, 2469 & 2464.)

We have carefully reviewed the record. The transcript of the sentencing hearing does not "clearly indicate" that the trial court would have reached the same result if it had applied the *Miller* factors. (*Gutierrez, supra,* 58 Cal.4th at p. 1391.) As in *Gutierrez,* the prosecutor cited *Guinn* as controlling authority for the proposition that an LWOP sentence was the presumptive sentence. In accord with *Gutierrez,* we presume the trial court followed and applied the law that governed at the time, and therefore we "cannot say with confidence what sentence [it] would have imposed absent the presumption." (*Ibid.*) We will therefore remand this case for resentencing in accordance with the principles set forth in both *Miller* and *Gutierrez.*

## IV. DISPOSITION

Petitioner's sentence is vacated and the matter is remanded for resentencing.

18

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:


_____
MIHARA, J.



_____
MÁRQUEZ, J.



*In re Willover*
**H040757**

Trial Court:

Monterey County Superior Court
Superior Court No.: SM980198, HC7940


Trial Judge:

Hon. Mark E. Hood


Attorneys for Petitioner:
Norman Willover

Lawrence Gibbs

Sixth District Appellate Program


Attorney for Respondent:
The People

Rene A. Chacon
Office of the Attorney General


*In re Willover*
**H040757**